GEORGIA *v.* PENNSYLVANIA RAILROAD CO. ET AL.

No. 11, original.   Argued January 2, 1945.—Decided March 26, 1945.

440

*Mr. Ellis Arnall,* Governor of Georgia, with whom *Messrs. T. Grady Head,* Attorney General, *Marshall L. Allison* and *Claude Shaw,* Assistant Attorneys General, and *Edgar Watkins,* Deputy Assistant Attorney General, were on the brief, for complainant.

*Mr. John Dickinson,* with whom *Messrs. Anthony P. Donadio, K. L. Richmond, W. T. Pierson, Thomas P. Healy, D. Lynch Younger, E. Randolph Williams* and *Carleton S. Hadley* were on the brief, for the Pennsylvania Railroad Co. et al.; *Mr. George S. Leisure,* with whom *Messrs. Ralstone R. Irvine, Robert W. Purcell, James V. Hayes* and *Theodore S. Hope, Jr.* were on the brief, for the Chesapeake & Ohio Railway Co. et al.; *Mr. Sidney S. Alderman,* with whom *Messrs. Thomas W. Davis, J. H. McChord, Vernon W. Foster, Elmer A. Smith, J. N. Flowers, William H. Swiggart* and *S. R. Prince* were on the brief, for the Southern Railway Co. et al.; and *Mr. W. R. C. Cocke* submitted for the Seaboard Air Line Railway Co., defendants.

*Attorney General Biddle, Solicitor General Fahy, Assistant Attorney General Berge, Messrs. Edward Dumbauld, Edward P. Hodges, Sigmund Timberg* and *Arne C. Wiprud* filed a brief on behalf of the United States, as *amicus curiae,* supporting the complainant.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The State of Georgia by this motion for leave to file a bill of complaint [1] seeks to invoke the original jurisdiction of this Court under Art. III, § 2 of the Constitution. See Judicial Code § 233, 28 U. S. C. § 341. The defendants are some twenty railroad companies. On November 6, 1944, we issued a rule to show cause why Georgia should not be permitted to file its bill of complaint. Returns to the rule have been made and oral argument had.

Georgia sues in four capacities, only two of which we need mention: (1) in her capacity as a quasi-sovereign or as agent and protector of her people against a continuing wrong done to them; and (2) in her capacity as a proprietor to redress wrongs suffered by the State as the owner of a railroad and as the owner and operator of various institutions of the State.

The essence of the complaint is a charge of a conspiracy among the defendants in restraint of trade and commerce among the States. It alleges that they have fixed arbitrary and noncompetitive rates and charges for transportation of freight by railroad to and from Georgia so as to prefer the ports of other States over the ports of Georgia. It charges that some sixty rate bureaus, committees, conferences, associations and other private rate-fixing agencies have been utilized by defendants to fix these rates; that no road can change joint through rates without the approval of these private agencies; that this private rate-fixing machinery which is not sanctioned by the Interstate Commerce Act and which is prohibited by the anti-trust Acts has put the effective control of rates to

---

[1] The original bill of complaint dated June 12, 1944 was followed by an amended bill of complaint dated September 15, 1944. Our references throughout are to the amended bill.

and from Georgia in the hands of the defendants. The complaint alleges that these practices in purpose and effect give manufacturers, sellers and other shippers in the North an advantage over manufacturers, shippers and others in Georgia. It alleges that the rates so fixed are approximately 39 per cent higher than the rates and charges for transportation of like commodities for like distances between points in the North. It alleges that the defendants who have lines wholly or principally in the South are generally dominated and coerced by the defendants who have northern roads, and therefore that, even when the southern defendants desire, they cannot publish joint through rates between Georgia and the North when the northern carriers refuse to join in such rates.

It is alleged that the rates as a result of the conspiracy are so fixed as

"(a) to deny to many of Georgia's products equal access with those of other States to the national market;

(b) to limit in a general way the Georgia economy to staple agricultural products, to restrict and curtail opportunity in manufacturing, shipping and commerce, and to prevent the full and complete utilization of the natural wealth of the State;

(c) to frustrate and counteract the measures taken by the State to promote a well-rounded agricultural program, encourage manufacture and shipping, provide full employment, and promote the general progress and welfare of its people; and

(d) to hold the Georgia economy in a state of arrested development."

The complaint alleges that the defendants are not citizens of Georgia; that Georgia is without remedy in her own courts, as the defendants are outside her jurisdiction; that she has no administrative remedy, the Interstate Commerce Commission having no power to afford

relief against such a conspiracy; that the issues presented constitute a justiciable question.

The prayer is for damages and for injunctive relief.

We will return later to the cause of action which Georgia seeks to allege. It is sufficient at this point to say that for purposes of this motion for leave to file we construe the allegation that defendants have conspired to fix the rates so as to "prefer" the ports of other States over the ports of Georgia as a charge that defendants have conspired to fix rates so as to discriminate against Georgia. And we construe the allegation that the southern defendants are dominated and coerced by the northern roads and cannot publish joint through rates when the northern roads refuse to join as a charge that the northern roads use coercion on the southern roads in the fixing of joint through rates.

Defendants in their returns pray that the motion for leave to file be denied on three grounds: (1) that the complaint presents no justiciable controversy; (2) that the complaint fails to state a cause of action; and (3) that two of the defendants are citizens of Georgia. Leave to file should of course be denied if it is plain that no relief may be granted in the exercise of the original jurisdiction of this Court. See *Alabama* v. *Arizona,* 291 U. S. 286, 291–292; *Arizona* v. *California,* 298 U. S. 558, 572.

*Justiciable Controversy.* It is said that the bill does not set forth a justiciable controversy within the rule of *Massachusetts* v. *Mellon,* 262 U. S. 447, and *Florida* v. *Mellon,* 273 U. S. 12. We take the other view, for we are of the opinion that Georgia as *parens patriae* and as proprietor of various institutions asserts a claim within judicial cognizance. The complaint of Georgia in those respects is not of a political or governmental character. There is involved no question of distribution of powers between the State and the national government as in *Massachusetts* v. *Mellon* and in *Florida* v. *Mellon, supra.* And, as we shall de-

446

velop more fully when we turn to a consideration of the assertion that no cause of action has been stated, we are not asked to resolve a dispute which has been withdrawn from the judiciary or which by the charter of our government has been reposed in departments other than the judiciary. Cf. *Coleman* v. *Miller,* 307 U. S. 433, 456, 460. The complaint alleges a conspiracy to restrain trade and commerce through the fixing of rates. The history of restraints of trade makes it plain that these problems present judicial questions with which courts have long dealt.[2]

It is of course true that Georgia does not have a right to invoke the original jurisdiction of the Court merely because there may be involved a judicial question. It is not enough that a State is plaintiff. The original jurisdiction is confined to civil suits where damage has been inflicted or is threatened, not to the enforcement of penal statutes of a State. *Wisconsin* v. *Pelican Ins. Co.,* 127 U. S. 265, 297–300. And though the suit is civil, leave to file will be denied where it appears that the suit brought in the name of the State is in reality for the benefit of particular individuals. *Oklahoma* v. *Atchison, T. & S. F. R. Co.,* 220 U. S. 277; *Oklahoma* v. *Cook,* 304 U. S. 387; *Jones* v. *Bowles,* 322 U. S. 707. Moreover, *Massachusetts* v. *Mellon* and *Florida* v. *Mellon, supra,* make plain that the United States, not the State, represents the citizens as *parens patriae* in their relations to the federal government.

The present controversy, however, does not fall within any of those categories. This is a civil, not a criminal, proceeding. Nor is this a situation where the United States rather than Georgia stands as *parens patriae* to the citizens of Georgia. This is not a suit like those in *Massachusetts* v. *Mellon,* and *Florida* v. *Mellon, supra,* where

[2] See McLaughlin, Cases on the Federal Anti-Trust Laws (1933), pp. 7–42; Thornton, Combinations in Restraint of Trade (1928), chs. II, III.

a State sought to protect her citizens from the operation of federal statutes. Here Georgia asserts rights based on the anti-trust laws. The fact that the United States may bring criminal prosecutions or suits for injunctions under those laws does not mean that Georgia may not maintain the present suit. As we have seen, Georgia sues as a proprietor to redress wrongs suffered by it as the owner of a railroad and as the owner and operator of various public institutions. Georgia, suing for her own injuries, is a "person" within the meaning of § 16 of the Clayton Act; she is authorized to maintain suits to restrain violations of the anti-trust laws or to recover damages by reason thereof. *Georgia* v. *Evans,* 316 U. S. 159. But Georgia is not confined to suits designed to protect only her proprietary interests. The rights which Georgia asserts, *parens patriae,* are those arising from an alleged conspiracy of private persons whose price-fixing scheme, it is said, has injured the economy of Georgia. Those rights are of course based on federal laws. The enforcement of the criminal sanctions of these acts has been entrusted exclusively to the federal government. See *Georgia* v. *Evans, supra,* p. 162. But when it came to other sanctions Congress followed a different course and authorized civil suits not only by the United States but by other persons as well. And we find no indication that, when Congress fashioned those civil remedies, it restricted the States to suits to protect their proprietary interests. Suits by a State, *parens patriae,* have long been recognized. There is no apparent reason why those suits should be excluded from the purview of the anti-trust acts.

In determining whether a State may invoke our original jurisdiction in a dispute which is justiciable (*Oklahoma* v. *Cook, supra,* p. 393) the interests of the State are not confined to those which are proprietary; they embrace the so-called "quasi-sovereign" interests which in the words of *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237,

are "independent of and behind the titles of its citizens, in all the earth and air within its domain." In that case this Court enjoined manufacturing companies from discharging noxious gas from their works in Tennessee over Georgia's territory. It was pointed out that "It is a fair and reasonable demand on the part of a sovereign that the air over its territory should not be polluted on a great scale by sulphurous acid gas, that the forests on its mountains, be they better or worse, and whatever domestic destruction they have suffered, should not be further destroyed or threatened by the act of persons beyond its control, that the crops and orchards on its hills should not be endangered from the same source." 206 U. S. p. 238. That case followed *Missouri* v. *Illinois,* 180 U. S. 208, where Missouri was granted leave to file a bill seeking to enjoin the discharge of sewage into the Mississippi.[3] The Court observed that "if the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them." 180 U. S. p. 241. And see *New York* v. *New Jersey,* 256 U. S. 296, 301–302. In *Kansas* v. *Colorado,* 206 U. S. 46, Kansas was allowed to sue to restrain the diversion of water from the Arkansas River, an interstate stream. The Court in upholding the right of Kansas to maintain the suit stated: "It is not acting directly and solely for the benefit of any individual citizen to protect his riparian rights. Beyond its property rights it has an interest as a State in this large tract of land bordering on the Arkansas River. Its prosperity affects the general welfare of the State. The controversy rises, therefore, above a mere question of local private right and involves a matter of state interest, and must be considered from that standpoint." 206 U. S. p. 99. And see *Colorado* v. *Kansas,* 320 U. S. 383; *North Dakota* v. *Minnesota,* 263

---

[3] And see *Missouri* v. *Illinois,* 200 U. S. 496; *Wisconsin* v. *Illinois,* 278 U. S. 367.

U. S. 365.  In *Pennsylvania* v. *West Virginia*, 262 U. S. 553, Pennsylvania and Ohio were allowed to maintain suits which sought to enjoin West Virginia from interfering with the flow of natural gas from West Virginia to the other states.  The Court said:

"The attitude of the complainant States is not that of mere volunteers attempting to vindicate the freedom of interstate commerce or to redress purely private grievances.  Each sues to protect a two-fold interest—one as the proprietor of various public institutions and schools whose supply of gas will be largely curtailed or cut off by the threatened interference with the interstate current, and the other as the representative of the consuming public whose supply will be similarly affected.  Both interests are substantial and both are threatened with serious injury.

"Each State uses large amounts of the gas in her several institutions and schools,—the greater part in the discharge of duties which are relatively imperative.  A break or cessation in the supply will embarrass her greatly in the discharge of those duties and expose thousands of dependents and school children to serious discomfort, if not more.  To substitute another form of fuel will involve very large public expenditures.

"The private consumers in each State not only include most of the inhabitants of many urban communities but constitute a substantial portion of the State's population.  Their health, comfort and welfare are seriously jeopardized by the threatened withdrawal of the gas from the interstate stream.  This is a matter of grave public concern in which the State, as the representative of the public, has an interest apart from that of the individuals affected.  It is not merely a remote or ethical interest but one which is immediate and recognized by law."  262 U. S. pp. 591–592.

It seems to us clear that under the authority of these cases Georgia may maintain this suit as *parens patriae* acting on behalf of her citizens though here, as in *Georgia v. Tennessee Copper Co., supra*, p. 237, we treat the injury to the State as proprietor merely as a "makeweight." The original jurisdiction of this Court is one of the mighty instruments which the framers of the Constitution provided so that adequate machinery might be available for the peaceful settlement of disputes between States and between a State and citizens of another State. See *Missouri v. Illinois, supra*, pp. 219–224; *Virginia v. West Virginia*, 246 U. S. 565, 599. Trade barriers, recriminations, intense commercial rivalries had plagued the colonies.[4] The traditional methods available to a sovereign for the settlement of such disputes were diplomacy and war. Suit in this Court was provided as an alternative. *Missouri v. Illinois, supra*, p. 241; *Georgia v. Tennessee Copper Co., supra*, p. 237.

If the allegations of the bill are taken as true, the economy of Georgia and the welfare of her citizens have seriously suffered as the result of this alleged conspiracy. Discriminatory rates are but one form of trade barriers. They may cause a blight no less serious than the spread of noxious gas over the land or the deposit of sewage in the streams. They may affect the prosperity and welfare of a State as profoundly as any diversion of waters from the rivers. They may stifle, impede, or cripple old industries and prevent the establishment of new ones. They may arrest the development of a State or put it at a decided disadvantage in competitive markets. Such a charge at least equals in gravity the one which Pennsylvania and Ohio had with West Virginia over the curtailment of the flow of natural gas from the West Virginia

---

[4] See 1 Beveridge, The Life of John Marshall (1916), pp. 310–311; Bancroft, History of the Formation of the Constitution (1885), pp. 27, 130, 183, 187, 454.

fields. There are substitute fuels to which the economy of a State might be adjusted. But discriminatory rates fastened on a region have a more permanent and insidious quality. Georgia as a representative of the public is complaining of a wrong which, if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her sister States. These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected. Georgia's interest is not remote; it is immediate. If we denied Georgia as *parens patriae* the right to invoke the original jurisdiction of the Court in a matter of that gravity, we would whittle the concept of justiciability down to the stature of minor or conventional controversies. There is no warrant for such a restriction.

*Oklahoma* v. *Atchison, T. & S. F. R. Co., supra,* is not opposed to this view. In that case, the defendant railroad company had obtained a grant from Congress to locate and maintain a railway line through the Indian Territory out of which the State of Oklahoma was later formed. The federal act provided certain maximum transportation rates which the company might charge. Oklahoma sued to cancel the grant, to have the property granted decreed to be in the State of Oklahoma as *cestui que trust,* to enjoin the defendant from operating a railroad in the State, and to enjoin *pendente lite* the exaction of greater rates than the maximum rates specified. The Court construed the Act of Congress as subjecting the rates to federal control until the territory became a part of a State, at which time the rates became subject to state control. The Court held that our original jurisdiction could not be invoked by a State merely because its citizens were injured. We adhere to that decision. It does not control the present one. This is no attempt to utilize our orig-

inal jurisdiction in substitution for the established methods of enforcing local law. This is not a suit in which a State is a mere nominal plaintiff, individual shippers being the real complainants. This is a suit in which Georgia asserts claims arising out of federal laws and the gravamen of which runs far beyond the claim of damage to individual shippers.

Since the claim which Georgia asserts as *parens patriae* as well as proprietor meets the standards of justiciability and since Georgia is a "person" entitled to enforce the civil sanctions of the anti-trust laws, the reasons which have been advanced for denying Georgia the opportunity to present her cause of action to this Court fail.

*Cause of Action.* It is argued that the complaint fails to state a cause of action. (1) It is pointed out that under the principle of the *Abilene* case no action for damages on the basis of unjust, unreasonable, or discriminatory railroad rates may be maintained without prior resort to the Interstate Commerce Commission. *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426; *Great Northern R. Co.* v. *Merchants Elevator Co.*, 259 U. S. 285. (2) It is said that an injunction may not be granted to restrain rates alleged to be unreasonable or discriminatory where there has been no prior determination of the matter by the Commission and that the only way a State or any other person may obtain a judicial determination of the legality of a rate is by review of the Commission's order. *Baltimore & Ohio R. Co.* v. *Pitcairn Coal Co.*, 215 U. S. 481; *North Dakota* v. *Chicago & N. W. R. Co.*, 257 U. S. 485; *Texas* v. *Interstate Commerce Commission*, 258 U. S. 158. (3) It is said that damages under the anti-trust laws may not be recovered against railroad carriers though the rates approved by the Commission were fixed pursuant to a conspiracy. *Keogh* v. *Chicago & N. W. R. Co.*, 260 U. S. 156. (4) It is said that persons other than the United States are barred from enjoining violations of the anti-

trust laws by virtue of § 16 of the Clayton Act. 38 Stat. 737, 15 U. S. C. § 26. See *Central Transfer Co.* v. *Terminal R. Assn.*, 288 U. S. 469, 473–475; *Terminal Warehouse Co.* v. *Pennsylvania R. Co.*, 297 U. S. 500, 513. (5) It is argued that Georgia cannot maintain an action on common law principles based upon a conspiracy among carriers to fix rates.

We think it is clear from the *Keogh* case alone that Georgia may not recover damages even if the conspiracy alleged were shown to exist. That was a suit for damages under § 7 of the Sherman Act. 26 Stat. 210. The Court recognized that although the rates fixed had been found reasonable and non-discriminatory by the Commission, the United States was not barred from enforcing the remedies of the Sherman Act. 260 U. S. pp. 161–162. It held, however, that for purposes of a suit for damages a rate was not necessarily illegal because it was the result of a conspiracy in restraint of trade. The legal rights of a shipper against a carrier in respect to a rate are to be measured by the published tariff. That rate until suspended or set aside was for all purposes the legal rate as between shipper and carrier and may not be varied or enlarged either by the contract or tort of the carrier. And it added: "This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated. If a shipper could recover under § 7 of the Anti-Trust Act for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors." 260 U. S. p. 163. The reasoning and precedent of that case apply with full force here. But it does not dispose of the main prayer of the bill, stressed at the argument, which asks for relief by way of injunction.

It is clear that a suit could not be maintained here to review, annul, or set aside an order of the Interstate Commerce Commission. Congress has prescribed the method for obtaining that relief. It is exclusive of all other remedies, including a suit by a State in this Court. *North Dakota* v. *Chicago & N. W. R. Co., supra; Texas* v. *Interstate Commerce Commission, supra.* The same result obtains where the basis for attacking an order of the Commission is a violation of the anti-trust laws, save in the case where the United States is the complainant. For § 16 of the Clayton Act which gives relief by way of injunction against threatened loss or damage through violation of the anti-trust laws provides that no one except the United States shall be entitled to bring such suits against common carriers subject to the Interstate Commerce Act "in respect of any matter subject to the regulation, supervision, or other jurisdiction" of the Commission. *Central Transfer Co.* v. *Terminal R. Assn., supra,* indicates that if Georgia in the present proceeding sought to set aside the rates of the defendants, leave to file would have to be denied. In that case the Commission had approved certain rate schedules which entailed abandoning certain "off-track" stations and the employment by the carriers of a single transfer company to do interstation hauling. The carriers proceeded to make an agreement to carry out the program which had been submitted to the Commission and which was later approved by it. Suit was brought by a private company to enjoin performance of the contract on the ground that it created a monopoly in violation of the anti-trust laws. The Court held that the suit was barred by § 16 of the Clayton Act. The Court pointed out that the purpose of § 16 was "to preclude any interference by injunction with any business or transactions of interstate carriers of sufficient public significance and importance to be within the jurisdiction of the Commission, except when the suit is brought by the Government

itself." 288 U. S. p. 475. It added (p. 476): "True, a contract may precede and have existence apart from the several acts required to perform it, and conceivably all of those acts might be done if no contract or agreement to perform them had ever existed. But when they are done in performance of an agreement, there is no way by which the agreement itself can be assailed by injunction except by restraining acts done in performance of it. That, in this case, the statute forbids, not because the contract is within the jurisdiction of the Interstate Commerce Commission, but because the acts done in performance of it, which must necessarily be enjoined if any relief is given, are matters subject to the jurisdiction of the Commission." The policy behind these restrictions placed on suitors by the Congress was aptly stated in *Terminal Warehouse Co.* v. *Pennsylvania R. Co., supra,* p. 513, as follows: "If a sufferer from the discriminatory acts of carriers by rail or by water may sue for an injunction under the Clayton Act without resort in the first instance to the regulatory commission, the unity of the system of regulation breaks down beyond repair." We adhere to these decisions. But we do not believe they or the principles for which they stand are a barrier to the maintenance of this suit by Georgia.

The relief which Georgia seeks is not a matter subject to the jurisdiction of the Commission. Georgia in this proceeding is not seeking an injunction against the continuance of any tariff; nor does she seek to have any tariff provision cancelled. She merely asks that the alleged rate-fixing combination and conspiracy among the defendant-carriers be enjoined. As we shall see, that is a matter over which the Commission has no jurisdiction. And an injunction designed to put an end to the conspiracy need not enjoin operation under established rates as would have been the case had an injunction issued in *Central Transfer Co.* v. *Terminal R. Assn., supra.*

These carriers are subject to the anti-trust laws. *United States* v. *Southern Pacific Co.,* 259 U. S. 214. Conspiracies among carriers to fix rates were included in the broad sweep of the Sherman Act. *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290; *United States* v. *Joint Traffic Assn.,* 171 U. S. 505. Congress by § 11 of the Clayton Act entrusted the Commission with authority to enforce compliance with certain of its provisions "where applicable to common carriers" under the Commission's jurisdiction.[5] It has the power to lift the ban of the anti-trust laws in favor of carriers who merge or consolidate (*New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 25–26) and the duty to give weight to the anti-trust policy of the nation before approving mergers and consolidations. *McLean Trucking Co.* v. *United States,* 321 U. S. 67. But Congress has not given the Commission comparable authority to remove rate-fixing combinations from the prohibitions contained in the anti-trust laws. It has not placed these combinations under the control and supervision of the Commission. Nor has it empowered the Commission to proceed against such combinations and through cease and desist orders or otherwise to put an end to their activities. Regulated industries are not *per se* exempt from the Sherman Act. *United States* v. *Borden Co.,* 308 U. S. 188, 198 *et seq.* It is true that the Commission's regulation of carriers has greatly expanded since the Sherman Act. See *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co.,* 284 U. S. 370, 385–386. But it is elementary that repeals by implication are not

---

[5] These provisions are those relating to discriminations in price, services, or facilities (§ 2); certain sales of goods, wares, merchandise and the like (§ 3); acquisition by one corporation of the stock of another (§ 7); interlocking directorates and officers (§ 8). See 15 U. S. C. §§ 13, 14, 18, and 19. The enforcement machinery is composed of cease and desist orders enforceable in the courts. 15 U. S. C. § 21.

favored. Only a clear repugnancy between the old law and the new results in the former giving way and then only *pro tanto* to the extent of the repugnancy. *United States* v. *Borden, supra,* pp. 198, 199. None of the powers acquired by the Commission since the enactment of the Sherman Act relates to the regulation of rate-fixing combinations. Twice Congress has been tendered proposals to legalize rate-fixing combinations.[6] But it has not adopted them. In view of this history we can only conclude that they have no immunity from the anti-trust laws.

It is pointed out, however, that under § 1 (4) of the Interstate Commerce Act (54 Stat. 900, 49 U. S. C. § 1 (4)) it is "the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor, and to establish reasonable through routes with other such carriers, and just and reasonable rates, fares, charges, and classifications applicable thereto." And it is noted that agreement among carriers is provided in the establishment of joint rates. § 6. That is true. But it would be a perversion of those sections to hold that they legalize a rate-fixing combination of the character alleged to exist here. The collaboration contemplated in the fixing of through and joint rates is of a restrictive nature. We do not stop at this stage of the proceedings to delineate the legitimate area in which that collaboration may operate. In the *Keogh* case (260 U. S. 156) the suit was one for damages under the Sherman Act. The charge was that the defendant carriers

---

[6] See (1) 51 Cong. Record, 63d Cong., 2d Sess., pp. 9582, 9583; (2) S. 942, 78th Cong., 1st Sess.; H. R. 2720, 78th Cong., 1st Sess. These latter proposals were designed (1) to make lawful the fixing of rates by carriers through rate bureaus, conferences, or associations; and (2) to put those group activities under the control of the Commission. The history and activities of rate bureaus are extensively reviewed in Hearings, Senate Committee on Interstate Commerce on S. 942, Regulation of Rate Bureaus, 78th Cong., 1st Sess.

458

had formed a rate bureau or committee to secure agreement in respect to freight rates among the constituent railroad companies which would otherwise be competing carriers. As we have seen, the Court held that damages could not be recovered. But Mr. Justice Brandeis speaking for a unanimous Court stated that a conspiracy to fix rates might be illegal though the rates fixed were reasonable and non-discriminatory. He said (260 U. S. pp. 161–162): "All the rates fixed were reasonable and non-discriminatory. That was settled by the proceedings before the Commission. . . . But under the Anti-Trust Act, a combination of carriers to fix reasonable and non-discriminatory rates may be illegal; and if so, the Government may have redress by criminal proceedings under § 3, by injunction under § 4, and by forfeiture under § 6. That was settled by *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, and *United States* v. *Joint Traffic Association,* 171 U. S. 505. The fact that these rates had been approved by the Commission would not, it seems, bar proceedings by the Government." The *Trans-Missouri Freight Assn.* case and the *Joint Traffic Assn.* case have been followed in other fields. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, and the cases which preceded it indicate the extent of the ban on price-fixing under the Sherman Act. But we need not at this juncture determine the full extent to which that principle is applicable in the fixing of joint through rates. It is sufficient here to note that we find no warrant in the Interstate Commerce Act and the Sherman Act for saying that the authority to fix joint through rates clothes with legality a conspiracy to discriminate against a State or a region, to use coercion in the fixing of rates, or to put in the hands of a combination of carriers a veto power over rates proposed by a single carrier. The type of regulation which Congress chose did not eliminate the emphasis on competition and individual freedom of action in rate-

making. 1 Sharfman, The Interstate Commerce Commission (1931), p. 81. The Act was designed to preserve private initiative in rate-making as indicated by the duty of each common carrier to initiate its own rates. *Arizona Grocery Co.* v. *Atchison, T. & S. F. R. Co., supra.* If a combination of the character described in this bill of complaint is immune from suit, that freedom of action disappears. The coercive and collusive influences of group action take its place.[7] A monopoly power is created under the aegis of private parties without Congressional sanction and without governmental supervision or control.

These considerations emphasize the irrelevancy to the present problem of the fact that the Commission has authority to remove discriminatory rates of the character alleged to exist here. Under § 3 (1) of the Act rates are declared unlawful which give "any undue or unreasonable preference or advantage" to any port, region, district, territory and the like. And the Commission has taken some action in that regard. See *Alabama* v. *New York C. R. Co.,* 235 I. C. C. 255; 237 I. C. C. 515; *Live Stock to and from the South,* 253 I. C. C. 241. The present bill does not seek to have the Court act in the place of the Commission. It seeks to remove from the field of rate-making the influences of a combination which exceed the limits of the collaboration authorized for the fixing of joint through

---

[7] We have considered the argument that Certificate No. 44, issued March 20, 1943 under § 12 of the Act of June 11, 1942 (56 Stat. 357) by the Chairman of the War Production Board (8 Fed. Reg. 3804) protects this alleged combination from the charges contained in the bill. That certificate approves joint action by common carriers through rate bureaus and the like in the initiation and establishment of rates. We do not stop to analyze it beyond observing that in no respect would it be a bar to the present action. It does not purport to be retroactive. It does not sanction the use of coercion. It does not authorize any combination to discriminate against a region in the establishment of rates. Moreover, legal means may be employed for an illegal end.

rates. It seeks to put an end to discriminatory and coercive practices. The aim is to make it possible for individual carriers to perform their duty under the Act, so that whatever tariffs may be continued in effect or superseded by new ones may be tariffs which are free from the restrictive, discriminatory, and coercive influences of the combination. That is not to undercut or impair the primary jurisdiction of the Commission over rates. It is to free the rate-making function of the influences of a conspiracy over which the Commission has no authority but which if proven to exist can only hinder the Commission in the tasks with which it is confronted.

What we have said disposes for the most part of the argument that recognized principles of equity prevent us from granting the relief which is asked. Sec. 16 of the Clayton Act provides for relief by injunction "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." Those requirements are sufficiently satisfied to justify a filing of this bill. It must be remembered that this is a suit to dissolve an illegal combination or to confine it to the legitimate area of collaboration. That relief cannot be obtained from the Commission for it has no supervisory authority over the combination. It is true that the injury to Georgia is not in the existence of the combination *per se* but in the rates which are fixed by the combination. The fact that the rates which have been fixed may or may not be held unlawful by the Commission is immaterial to the issue before us. The *Keogh* case indicates that even a combination to fix reasonable and non-discriminatory rates may be illegal. 260 U. S. p. 161. The reason is that the Interstate Commerce Act does not provide remedies for the correction of all the abuses of rate-making which might constitute violations of the anti-trust laws. Thus a "zone of reasonableness exists between maxima and

minima within which a carrier is ordinarily free to adjust its charges for itself." *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 506. Within that zone the Commission lacks power to grant relief even though the rates are raised to the maxima by a conspiracy among carriers who employ unlawful tactics. If the rate-making function is freed from the unlawful restraints of the alleged conspiracy, the rates of the future will then be fixed in the manner envisioned by Congress when it enacted this legislation. Damage must be presumed to flow from a conspiracy to manipulate rates within that zone.

Moreover, the relief sought from this Court is not an uprooting of established rates. We are not asked for a decree which would be an idle gesture. We are not asked to enjoin what the Commission might later approve or condone. We are not asked to trench on the domain of the Commission; nor need any decree which may be ultimately entered in this cause have that effect. Georgia alleges, "No administrative proceeding directed against a particular schedule of rates would afford relief to the State of Georgia so long as the defendants remained free to promulgate rates by collusive agreement. Until the conspiracy is ended, the corrosion of new schedules, established by the collusive power of the defendant carriers acting in concert, would frustrate any action sought to be taken by administrative process to redress the grievances from which the State of Georgia suffers." Rate-making is a continuous process. Georgia is seeking· a decree which will prevent in the future the kind of harmful conduct which has occurred in the past. Take the case of coercion. If it is shown that the alleged combination exists and uses coercion in the fixing of· joint through rates, only an injunction aimed at future conduct of that character can give adequate relief. Indeed, so long as the collaboration which exists exceeds lawful limits and continues in operation, the only effective remedy lies in dissolving the

combination or in confining it within legitimate boundaries. Any decree which is entered would look to the future and would free tomorrow's rate-making from the coercive and collusive influences alleged to exist. It cannot of course be determined in advance what rates may be lawfully established. But coercion can be enjoined. And so can a combination which has as its purpose an invidious discrimination against a region or locality. Dissolution of illegal combinations or a restriction of their conduct to lawful channels is a conventional form of relief accorded in anti-trust suits. No more is envisaged here. If the alleged combination is shown to exist, the decree which can be entered will be no idle or futile gesture. It will restore that degree of competition envisaged by Congress when it enacted the Interstate Commerce Act. It will eliminate from rate-making the collusive practices which the anti-trust laws condemn and which are not sanctioned by the Interstate Commerce Act. It will supply an effective remedy without which there can be only an endless effort to rectify the continuous injury inflicted by the unlawful combination. The threatened injury is clear. The damage alleged is sufficient to satisfy the preliminary requirements of this motion to file. There is no administrative control over the combination. And no adequate or effective remedy other than this suit is suggested which Georgia can employ to eliminate from rate-making the influences of the unlawful conspiracy alleged to exist here.

As we have said, we construe the bill to charge a conspiracy among defendants to use coercion in the fixing of rates and to discriminate against Georgia in the rates which are fixed. We hold that under that construction of the bill a cause of action under the anti-trust laws is alleged.[8] We intimate no opinion whether the bill might

---

[8] We therefore do not reach the question whether an action based on common law principles could be maintained.

be construed to charge more than that or whether a rate-fixing combination would be legal under the Interstate Commerce Act and the Sherman Act but for the features of discrimination and coercion charged here. We are dealing with the case only in a preliminary manner. Cf. *Missouri* v. *Illinois,* 200 U. S. 496, 517, 518. The complaint may have to be amplified and clarified as respects the coercion and discrimination charged, the damage suffered, or otherwise. We do not test it against the various types of motions and pleadings which may be filed. We construe it with that liberality accorded the complaint of a sovereign State as presenting a substantial question with sufficient clarity and specificity as to require a joinder of issues.

*Alleged Misjoinder of Parties Defendant.* Two of the defendant-corporations claim to be citizens of Georgia. Georgia asserts they are not. That issue is an involved one. Georgia may not of course invoke the original jurisdiction of the Court in a suit against one of her citizens. If either of the defendants who assert this defense is a citizen of Georgia and is a necessary party, leave to file would have to be denied. *Pennsylvania* v. *Quicksilver Mining Co.,* 10 Wall. 553; *California* v. *Southern Pacific Co.,* 157 U. S. 229; *Minnesota* v. *Northern Securities Co.,* 184 U. S. 199; *Louisiana* v. *Cummins,* 314 U. S. 577. We do not, however, have to decide at this stage of the proceedings whether the corporations in question are citizens of Georgia within the meaning of Art. III, § 2 of the Constitution. They are not indispensable parties. In a suit to enjoin a conspiracy not all the conspirators are necessary parties defendant.[9] It is averred and not challenged

---

[9] See *Waterman* v. *Canal-Louisiana Bank Co.,* 215 U. S. 33, 49; *United Shoe Machinery Corp.* v. *United States,* 258 U. S. 451, 456; *Hopkins* v. *Oxley Stave Co.,* 83 F. 912, 915–916; *Rocky Mountain Bell Tel. Co.* v. *Montana Federation of Labor,* 156 F. 809, 811–812. Cf. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 247.

that the other defendants are citizens of other States. The citizenship of the two defendants in question may be challenged by a motion to strike. *Louisiana* v. *Cummins,* 314 U. S. 580. But if they are stricken, the Court would not lose original jurisdiction over the controversy between Georgia and the other defendants.

*Exercise of Original Jurisdiction.* It does not necessarily follow that this Court must exercise its original jurisdiction. It has at times been held that this Court is not the appropriate tribunal in which to maintain suits brought by a State.

By Clause 1 of § 2 of Article III of the Constitution, the judicial power of the United States extends "to all Cases, in Law and Equity, arising under . . . the Laws of the United States" and "to Controversies . . . between a State and Citizens of another State." [10] Clause 2 of § 2 of Article III confers on this Court jurisdiction of those cases "in which a State shall be Party." But Clause 2 of § 2 merely distributes the jurisdiction conferred by Clause 1 of § 2. *Louisiana* v. *Texas,* 176 U. S. 1, 16; *Massachusetts* v. *Missouri,* 308 U. S. 1, 19. Clause 2 does not grant exclusive jurisdiction to this Court in the cases enumerated by it. *Ames* v. *Kansas,* 111 U. S. 449, 469; *Plaquemines Fruit Co.* v. *Henderson,* 170 U. S. 511. And it has been held that the exercise of that jurisdiction is not mandatory in every case. *North Dakota* v. *Chicago & N. W. R. Co., supra; Georgia* v. *Chattanooga,* 264 U. S. 472, 483; *Oklahoma* v. *Cook, supra,* p. 396; *Massachusetts* v. *Missouri, supra.* The Court in its discretion has withheld the exercise of its jurisdiction where there has been no want of another suitable forum to which the cause may be remitted in the interests of convenience, efficiency and jus-

---

[10] By reason of the Eleventh Amendment the judicial power of the United States does not extend to suits brought against a state by a citizen of another state.

tice. *Georgia* v. *Chattanooga, supra; Massachusetts* v. *Missouri, supra.*

There is some suggestion that the issues tendered by the bill of complaint present questions which a district court is quite competent to decide. It is pointed out that the remedy is one normally pursued in the district courts whose facilities and prescribed judicial duties are better adapted to the extended trial of issues of fact than are those of this Court. And it is said that no reason appears why the present suit may not conveniently proceed in the district court of the proper venue or why the convenience of the parties and witnesses, as well as of the courts, would be better served by a trial before a master appointed by this Court than by a trial in a district court with the customary appellate review.[11] The suggestion is that we deny the motion for leave to file, without prejudice to the maintenance of the suit in an appropriate district court. See *Massachusetts* v. *Missouri, supra*, pp. 17–18.

There is, however, a reason why we should not follow that procedure here though in other respects we assume it would be wholly appropriate. Sec. 16 of the Clayton Act (15 U. S. C. § 26), with the exceptions already noted, provides that "any person . . . shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws." Sec. 12 of the Clayton Act (15 U. S. C. § 22) provides that "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the

---

[11] In a proper case appellate review may be had directly in this Court by certiorari before judgment in the Circuit Court of Appeals. Judicial Code § 240 (a), 28 U. S. C. § 347 (a).

district of which it is an inhabitant, or wherever it may be found."

From these provisions it is apparent that Georgia might sue the defendants only in the judicial district where they are inhabitants or where they may be found or transact business. The bill of complaint, however, alleges and (with the exception of the two defendants already mentioned) it is not denied that "the parties defendant are not citizens of Georgia, or within the jurisdiction of its courts." If that allegation is taken as true, it is apparent that Georgia could not find all of the defendants in one of the judicial districts of Georgia so as to maintain a suit of this character against all of them in a district court in Georgia. Certainly we have no basis for assuming that all of the so-called northern roads, incorporated in such States as Pennsylvania, Maryland, Indiana, Ohio, New York and Illinois, are doing business in Georgia. It is said that most of the defendants can be found in Georgia, in the District of Columbia, or in other districts. But no such facts appear in the record before us. And we cannot take judicial notice of the district or districts wherein all of the defendants are "found" or "transact business." We would not be warranted in depriving Georgia of the original jurisdiction of this Court merely because each of the defendants could be found in some judicial district. Unless it were clear that all of them could be found in some convenient forum we could not say that Georgia had a "proper and adequate remedy" apart from the original jurisdiction of this Court. *Massachusetts* v. *Missouri, supra,* p. 19. No such showing has been made. Once a state makes out a case which comes within our original jurisdiction, its right to come here is established. There is no requirement in the Constitution that it go further and show that no other forum is available to it.

It is true that § 5 of the Sherman Act empowers the court before whom proceedings under § 4 are pending to

bring in parties who reside outside the district in which the court is held.[12] That procedure is available in civil suits brought by the United States. *Standard Oil Co.* v. *United States,* 221 U. S. 1, 46. But since § 4 is limited to suits brought by the United States, § 5 is similarly confined. See *Greer, Mills & Co.* v. *Stoller,* 77 F. 1; *Hansen Packing Co.* v. *Armour & Co.,* 16 F. Supp. 784, 787. Apart from specific exceptions created by Congress the jurisdiction of the district courts is territorial. As stated in *Robertson* v. *Railroad Labor Board,* 268 U. S. 619, 622–623:

"In a civil suit *in personam* jurisdiction over the defendant, as distinguished from venue, implies, among other things, either voluntary appearance by him or service of process upon him at a place where the officer serving it has authority to execute a writ of summons. Under the general provisions of law, a United States district court

---

[12] Sec. 4 reads:

"The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1–7 and 15 of this title; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises."

Sec. 5 reads:

"Whenever it shall appear to the court before which any proceeding under section 4 of this title may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpoenas to that end may be served in any district by the marshal thereof."

cannot issue process beyond the limits of the district, *Harkness* v. *Hyde*, 98 U. S. 476; *Ex parte Graham*, 3 Wash. 456; and a defendant in a civil suit can be subjected to its jurisdiction *in personam* only by service within the district. *Toland* v. *Sprague*, 12 Pet. 300, 330. Such was the general rule established by the Judiciary Act of September 24, 1789, c. 20, § 11, 1 Stat. 73, 79, in accordance with the practice at the common law. *Piquet* v. *Swan*, 5 Mason 35, 39 *et seq.* And such has been the general rule ever since. *Munter* v. *Weil Corset Co.*, 261 U. S. 276, 279."

It follows that we should not in the exercise of our discretion remit Georgia to the federal district courts for relief against the injuries of which she complains.

The motion for leave to file the amended bill of complaint is granted.

*It is so ordered.*

MR. CHIEF JUSTICE STONE, dissenting.

MR. JUSTICE ROBERTS, MR. JUSTICE FRANKFURTER, MR. JUSTICE JACKSON, and I think that the application of the State of Georgia for leave to file its amended bill of complaint in this Court should be denied (1) because in its judicial discretion, this Court should, without deciding the merits, leave the State to its remedy, if any, in the district court; (2) because the State lacks standing to present the only substantial issue in the case; and (3) because in the present posture of the case, the bill of complaint, for several reasons, fails to state a cause of action for which a court of equity can give effective relief.

As the Court concedes and for reasons which will presently be more fully considered, the State, under the rule laid down in *Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156, cannot maintain its suit for damages resulting from the alleged conspiracy to fix unlawful interstate railroad freight rates. But the Court grants Georgia's application to file on the ground that its bill of complaint,

as now amended, states a cause of action under § 16 of the Clayton Act, c. 323, 38 Stat. 737, 15 U. S. C. § 26, for an injunction against a conspiracy in violation of the antitrust laws. The Court holds that such a suit is within the original jurisdiction of this Court, conferred by Article III, § 2, Cls. 1 and 2 of the Constitution. Clause 1 provides that the judicial power of the United States extends "to all Cases, in Law and Equity, arising under . . . the Laws of the United States" and "to Controversies . . . between a State and Citizens of another State. . . ." Clause 2 confers on this Court original jurisdiction of those cases or controversies "in which a State shall be Party."

The Court disregards the fainthearted and unconvincing assertion of the State that it has a "common law" cause of action entitling it, independently of the Clayton Act and the federal antitrust laws, to maintain the present suit to restrain the alleged conspiracy to fix and maintain rates or charges for the interstate transportation of freight. We do not stop to consider this contention, for we are of the opinion that the objections to the maintenance of the present suit are essentially the same, whether it be regarded as a suit upon a cause of action arising under the Clayton Act or as one maintainable upon the equitable principles generally applicable in the federal courts independently of the Clayton Act.

I

If it be assumed that the State may maintain this action, either as *parens patriae* or for the injury to itself as a shipper and consignee of interstate freight, the right sought to be established is in point of substance like that of a private corporation, and the remedy asked is one normally pursued in district courts whose facilities and prescribed judicial duties are better adapted to the trial

of issues of fact than are those of this Court. In an original suit, even when the case is first referred to a master, this Court has the duty of making an independent examination of the evidence, a time-consuming process which seriously interferes with the discharge of our ever-increasing appellate duties. No reason appears why the present suit may not be as conveniently proceeded with in the district court of the proper venue as in this Court, or why the convenience of the parties and witnesses, as well as of the courts concerned, would be better served by a trial before a master appointed by this Court than by a trial in the appropriate district court with the customary appellate review. The case seems preeminently one where this Court may and should, in the exercise of its discretion and in the interest of a more efficient administration of justice, decline to exercise its jurisdiction, and remit the parties to the appropriate district court for the proper disposition of the case there. *North Dakota* v. *Chicago & Northwestern R. Co.,* 257 U. S. 485; *Georgia* v. *Chattanooga,* 264 U. S. 472, 483; *Oklahoma ex rel. Johnson* v. *Cook,* 304 U. S. 387, 396; *Massachusetts* v. *Missouri,* 308 U. S. 1, 17–20.

It is said that Georgia should not be deprived of the jurisdiction of this Court unless it can bring suit against all the defendants in one convenient district; and that there is no reason for assuming that all the defendants are amenable to suit in any one judicial district. But this puts the shoe on the wrong foot. It is Georgia which seeks to invoke our equity jurisdiction to hear this case, and when the question of our discretionary power to remit the parties to an adequate remedy in some other court is raised, it is incumbent upon it to show that it will be unable to reach all the defendants in a convenient district. And Georgia, although invited on the argument of this motion to do so, has made no showing that the suit cannot be proceeded with in a district court as readily as in this

Court. It made no such allegation in the amended bill of complaint which it tenders.[1] Hence we can only conclude that there is no such obstacle.

Further, it may be readily determined from standard works of reference, such as The Official Guide of the Railways, Moody's Steam Railroads, railroad timetables, and telephone directories, that the supposed difficulty is not a real one. Under § 12 of the Clayton Act, 15 U. S. C. § 22, these defendants may be sued in any district in which they are "found" or "transact business." A corporation both is "found" and "transacts business" in a district in which it operates a railroad or in which it maintains an office for the solicitation of freight or passenger traffic. See *Eastman Kodak Co.* v. *Southern Photo Co.*, 273 U. S. 359, 370–374; *United States* v. *Univis Lens Co.*, 316 U. S. 241, 246. These facts may be ascertained readily from the sources we have mentioned. It appears from them that there are several districts which would be as convenient for a trial as Washington, D. C., where proceedings before this Court would be had, and in which Georgia may obtain service of process upon at least as many of the defendants named in the complaint, as it may sue in this Court. For Georgia, itself, as well as this Court, seems reconciled to the suit's continuing here with but eighteen of the twenty defendants, since two may be required to be dismissed from the suit as citizens of Georgia.[2]

---

[1] Some reliance is placed on an allegation of the proposed amended complaint, which, in its context, is that the matters of which complaint is made are not within the jurisdiction of the *state* courts of Georgia; but that has no bearing on the question whether they are within the competence of a federal district court in Georgia or in any other State.

[2] These two defendants are the Seaboard Air Line Railway Co., and the Nashville, Chattanooga & St. Louis Ry., two of the largest of the southern defendants.

Of the twenty defendants, at least 18, not including the New York, Chicago & St. Louis R. Co. and the Richmond, Fredericksburg & Potomac R. Co. (R. F. & P.), are within the jurisdiction of the Northern District of Georgia. Of these defendants, at least 19, all but the R. F. & P., transact business in the Northern District of Illinois and in the Southern District of New York. At least 18, not including the R. F. & P. and the Nashville, Chattanooga & St. Louis Ry., are amenable to suit in the Western District of Pennsylvania and in the Eastern District of Michigan. At least 18, all but the R. F. & P. and the Carolina, Clinchfield and Ohio Railway,[3] are suable in the Eastern District of Missouri. Thus, there is no want of a suitable forum in which Georgia can reach at least the same number of defendants as she may sue in this Court. And it may be that service can be had on the other defendants in the districts named.

## II

If leave to file were denied, as we think it should be, without prejudice to a suit in a district court, it would be unnecessary at this stage of the proceedings to pass upon the question whether the suit is one which a court of equity could entertain. But in assuming jurisdiction of the case, the Court passes on that question. Hence it becomes necessary to state the reasons why, in the present posture of the case, the State does not state a case for relief within our original jurisdiction.

The gist of the cause of action asserted by the amended complaint is the injury visited upon the inhabitants of the State of Georgia by the alleged conspiracy among the defendant railroads to fix and maintain unlawfully excessive and discriminatory rates upon freight moving

---

[3] This defendant has been operating since 1924 as the Clinchfield Railroad Company, under lease to the Atlantic Coast Line R. Co. and the Louisville & Nashville R. Co.

by interstate rail transportation to and from Georgia. It is further alleged that the conspiracy violates the Sherman Act, and that its effect is to retard the economic growth of the State. To this is added what the Court concedes is a mere "makeweight" allegation of injury to the State in its capacity as an owner of a railroad, and as a shipper and consignee of freight.

But the inhabitants of the State who have suffered injury or who are threatened with injury by the unlawful practices alleged in the amended complaint are alone entitled to seek a legal remedy for their injury, and are the proper parties plaintiff in any suit to enforce their rights which are alleged to have been infringed. It has long been settled by the decisions of this Court that a State is without standing to maintain suit for injuries sustained by its citizens and inhabitants for which they may sue in their own behalf. *New Hampshire* v. *Louisiana,* 108 U. S. 76; *Louisiana* v. *Texas,* 176 U. S. 1; *Oklahoma* v. *Atchison, T. & S. F. R. Co.,* 220 U. S. 277, 289; *Oklahoma ex rel. Johnson* v. *Cook, supra,* 395–396; *Jones ex rel. Louisiana* v. *Bowles,* 322 U. S. 707. And many years ago it was established by decisions of this Court, whose authority has remained unimpaired until discarded by the opinion of the Court just announced, that a State does not stand in such relation to its citizens and inhabitants as to enable it to maintain an original suit in this Court to protect them by injunction from injuries to the State's economy resulting from the maintenance of unlawful interstate freight rates. *Oklahoma* v. *Atchison, T. & S. F. R. Co., supra;* cf. *Oklahoma* v. *Gulf, C. & S. F. R. Co.,* 220 U. S. 290, 301.

In the *Atchison Railway* case the plaintiff State alleged as the basis for its capacity to sue for relief, see 220 U. S. at 283–284, as does Georgia here, that the maintenance of the unlawful structure of freight rates on commodities widely used by inhabitants of the State was " 'a menace

to the future of said State' . . . [and] a hindrance to the growth of the State." This Court nevertheless held that the wrong was to the individuals of the State, and that the State was therefore not in a position to bring the suit as *parens patriae.*

The federal government is *parens patriae* with respect of the cause of action here alleged, and not the State. The federal government alone stands in such relationship to the citizens and inhabitants of the United States, as to permit the bringing of suit in their behalf, to protect them from the violation of federal laws relating to interstate commerce. See *Massachusetts* v. *Mellon,* 262 U. S. 447, 485–486; *Florida* v. *Mellon,* 273 U. S. 12, 18; *Jones ex rel. Louisiana* v. *Bowles, supra.* The Sherman Act, §§ 1–4, 15 U. S. C. §§ 1–4, recognized that it is the United States which is *parens patriae,* when it authorized the United States, not the individual States, to bring criminal prosecutions or suits for injunctions under the Act.

When the United States brings such a suit it is acting on behalf of the people of the United States, and in the national interest. The authority to bring such suits includes the discretionary authority not to bring them, if the responsible officers of the government are of the opinion that a suit is not warranted or would be of disservice to the national interest. To permit a State to bring a Sherman Act suit in behalf of the public is to fly in the face of the national policy established by Congress that the federal government should determine when such a suit is to be brought and how it should be prosecuted.

Thus the Sherman Act entrusted to the national government the duty to represent the people in the vindication of their rights under the antitrust laws. And this is confirmed by § 16 of the Clayton Act, which permits injunction suits by the United States against common carriers in respect of matters within the province of the Interstate Commerce Commission, while prohibiting such suits to all others, including a State.

## III

But even if, as the Court decides, Georgia has standing to maintain this suit, either in its own right or as *parens patriae,* and this Court has jurisdiction of the suit and should, in the exercise of its discretion, entertain it rather than remit the parties to the district court, the more important question remains whether the present suit is one in which a court of equity can give any effective relief.

The suit, so far as the Court allows its prosecution, is in equity to restrain an alleged conspiracy by the defendant rail carriers to fix and maintain unjust, unlawful, excessive, and discriminatory freight rates in violation of the antitrust laws. Section 16 of the Clayton Act, 15 U. S. C. § 26, authorizes "any person" to maintain a suit to restrain violations of the antitrust laws, and the State of Georgia, suing for its own injuries, is a person within the meaning of that section. *Georgia* v. *Evans,* 316 U. S. 159. The section provides that the relief to be given is an injunction "against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . ." And even though, as asserted, the suit be maintainable in the federal courts independently of the Clayton Act, the controlling principles governing the maintenance of the suit are the same in either case. The plaintiff must show threatened injury, *Vicksburg Waterworks Co.* v. *Vicksburg,* 185 U. S. 65, 82; *Paine Lumber Co.* v. *Neal,* 244 U. S. 459, 471; *Duplex Co.* v. *Deering,* 254 U. S. 443, 464–465; compare *Texas* v. *Florida,* 306 U. S. 398, 406–412 with *Massachusetts* v. *Missouri, supra,* 15–16, for which he is without other adequate remedy, *Matthews* v. *Rodgers,* 284 U. S. 521, 525–526, and cases cited; *Schoenthal* v. *Irving Trust Co.,* 287 U. S. 92, 94; *Myers* v. *Bethlehem Corp.,* 303 U. S. 41, 50–52, and

cases cited, and for which a court of equity is able to provide a remedy.

Georgia is threatened with injury only as the alleged conspiracy will result in the defendants' charging freight rates other than those which would exist in the absence of the conspiracy. That is, Georgia is not injured unless other rates than those now in force would be charged if the alleged conspiracy were to cease. While threatened damage in that sense could be assumed in a free competitive market, freight rates are not, under the Interstate Commerce Act, arrived at by the processes of free competition. The requirements of the Act are, as we will see, that the rates be just and reasonable and that they accord with the national transportation policy; the determination, in the first instance, whether the rates conform to those standards is left by Congress to the Interstate Commerce Commission, not to the courts. And unless Georgia can show that the present rates are unlawful, or that some other rate structure, which could be substituted for that now in force, would be just and reasonable, which Georgia cannot do without prior resort to the Commission, it can not show that any other structure could lawfully exist or that any injury to it is threatened by the conspiracy.

It follows from this that the prerequisites to the maintenance of the present suit are lacking for the following reasons: First, the State has not availed itself of or exhausted the administrative remedies provided by the Interstate Commerce Act, which may afford an adequate remedy and which must in any case precede the institution of the present suit in equity. Second, the suit as now framed falls within the proviso of § 16 of the Clayton Act denying to any "person," except the United States, authority "to bring suit in equity for injunctive relief against any common carrier subject to the provisions of" the Interstate Commerce Act, "in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission." And

third, in the absence of a determination by the Commission of the unlawfulness of the interstate freight tariffs filed or proposed to be filed by the several defendant carriers, no court of equity could, within the scope of its authority, frame a decree effectively enjoining an agreement or "conspiracy" to file tariffs establishing interstate freight rates.

*First.* The fact that a State may constitutionally invoke the jurisdiction of this Court in a suit brought by it against citizens of another State, does not dispense with the further requisite that if equitable relief is sought, the bill of complaint must state a cause of action cognizable in equity, of such a nature that the Court can give relief. *Texas* v. *Florida, supra,* 405. It is, as we have said, a familiar principle governing the exercise of equity jurisdiction of federal courts that equitable relief may be invoked only when the plaintiff is without other adequate remedy. And it is a corollary of this that a suitor may not seek such relief until he has exhausted his available administrative remedies. *Myers* v. *Bethlehem Corp., supra,* 51, n. 9, and cases cited; *Natural Gas Co.* v. *Slattery,* 302 U. S. 300, 310–311.

Here, by the terms of § 16 of the Clayton Act, as well as the principles generally governing equitable relief in the federal courts, the State, in order to secure the aid of equity, must show injury caused or threatened by the alleged unlawful acts of which it complains. Since the wrongful acts relied upon are a conspiracy to adopt and maintain unjust, unlawful, excessive or discriminatory freight rates, the only threatened injury to the State or its inhabitants, resulting from the conspiracy, is that which is or may be caused by such unlawful rates.

But the Interstate Commerce Act requires all interstate rail carriers, before putting into effect rates or charges for interstate transportation to adopt and file with the Commission just and reasonable rates. §§ 1 (4) (5) (6), 6 (1) (3), 49 U. S. C. §§ 1 (4) (5) (6), 6 (1) (3). It confers on

the Commission exclusive jurisdiction to determine the lawfulness of all rates appearing in the filed tariffs, and authority to suspend rates, and to order the railroad to cease and desist from charging other than the lawful rates. §§ 15 (1) (7), 49 U. S. C. § 15 (1) (7). The Commission's determination is to be in accordance with the "national transportation policy," to develop and preserve a national transportation system, see *Wisconsin Railroad Commission* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563, 585; *New England Divisions Case*, 261 U. S. 184, 189–190; *Railroad Commission* v. *Southern Pacific Co.*, 264 U. S. 331, 341– 342, and to establish and maintain "reasonable charges . . ., without . . . unfair or destructive competitive practices . . ." Transportation Act of 1940, c. 722, 54 Stat. 899, § 1.

The Commission is directed to consider the effect of rates on the movement of traffic, and the need of adequate and efficient railway transportation service at low cost, as well as the carriers' need of revenues sufficient to enable them to provide that service. Interstate Commerce Act, as amended, § 15a, 49 U. S. C. § 15a. In fixing rates or divisions, the Commission's determination may take account of the financial needs of the weaker carriers, by giving them a larger share of divisions, or by a general rate increase.[4] *New England Divisions Case, supra,* 189–

---

[4] Under the recapture clause of the Transportation Act of 1920, c. 91, 41 Stat. 488, § 422, adding § 15a to the Interstate Commerce Act, profits of carriers in excess of a fair return were held in trust for purposes of improving railroad service. *Dayton-Goose Creek R. Co.* v. *United States*, 263 U. S. 456. The recapture clause was repealed by the Act of June 16, 1933, c. 91, 48 Stat. 220, § 205. But its underlying purpose to permit rates sufficient to provide an adequate and efficient transportation system was reaffirmed by the declaration of a "National Transportation Policy" which the Commission is commanded to observe, by the Transportation Act of 1940, c. 722, 54 Stat. 899, § 1.

195; *Beaumont, S. L. & W. R. Co.* v. *United States,* 282 U. S. 74; cf. *Ann Arbor R. Co.* v. *United States,* 281 U. S. 658. It may fix minimum as well as maximum rates, § 15, 49 U. S. C. § 15, thus permitting it to prevent cut-throat competition and to protect weaker competitors. It may consider the effect of competing means of transportation, or other relevant circumstances and conditions attending the transportation service. See *Barringer & Co.* v. *United States,* 319 U. S. 1, and authorities cited; and on the considerations upon which the Commission fixes rates, see Sharfman, The Interstate Commerce Commission, Volume III–B. These and many other controlling factors, which enter the Commission's determination of rates, may be irrelevant to decision in an ordinary Sherman Act case, but are inextricably interwoven with the present suit, in which the State must establish that injury to it is threatened by the conspiracy to fix freight rates.

The Commission's orders are enforceable by injunctions in the district courts. § 16 (12), 49 U. S. C. § 16 (12). And the administrative remedy is exclusive of any which may be afforded by courts, at least until the Commission has passed upon the validity of the rates and classifications involved. *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426; *Robinson* v. *Baltimore & Ohio R. Co.,* 222 U. S. 506; *Northern Pacific R. Co.* v. *Solum,* 247 U. S. 477; *Director General of Railroads* v. *Viscose Co.,* 254 U. S. 498; *Midland Valley R. Co.* v. *Barkley,* 276 U. S. 482. Until the Commission acts, no court can say that the rates are not lawful and reasonable or that they are not within the lowest range of the zone of reasonableness. Nor can either be assumed, the burden being upon Georgia to show that it is injured by the acts of which it complains. And if the present rates are at the lowest point of reasonableness, as they well may be, Georgia is not injured, for in that event no lower rates

could be lawfully enforced by the Commission or the courts.

It is not without pertinence to the present application that the State of Georgia and seven other southern States are parties to proceedings now pending before the Interstate Commerce Commission, Docket No. 28300, Class Rate Investigation, and Docket No. 28310, Consolidated Freight Classification, in which the Chairman of the Georgia Public Service Commission has appeared as the principal witness on behalf of the State. In these proceedings the witness urged uniformity of rates in southern and official classification territories, in conformity to the official territory system of rates. The witness relied on § 3 (1) of the Act, 49 U. S. C. § 3 (1), making it unlawful for any rail carrier to make or give undue or unreasonable preferences or advantage to any particular person, locality or particular description of traffic; on § 1 (4) (5) (6), 49 U. S. C. § 1 (4) (5) (6), requiring common carriers by rail to establish just and reasonable rates, fares, charges and classifications; and on § 5 (b) of the Transportation Act of 1940, which requires the Commission to investigate the lawfulness of rates between points in different classification territories and to enter such orders as may be appropriate for the removal "of any unlawfulness which may be found to exist."

It is plain that the Commission has jurisdiction in these proceedings to set aside such unlawful rates as may have resulted from the conspiracies alleged in the State's amended complaint. If the Commission orders them set aside, nothing further remains for any court to do, for reasons which will presently more fully appear, save only as it may be asked to review or enforce the Commission's order. Without prior resort to the Commission, Georgia does not and cannot establish in a court proceeding that it is threatened with injury by the conspiracy or that it

is necessary for it to resort to the courts to secure the relief which it seeks in the present suit.

The State seeks to avoid these plain provisions of the Clayton and Interstate Commerce Acts by its insistence that by its amended complaint it asks relief not from the unlawful rates which have been or will be established as a result of the alleged conspiracy, but from the conspiracy itself, over which the Interstate Commerce Commission is said to have no jurisdiction, and from which it can give no relief. In the State's bill of complaint, as originally presented, it sought an injunction setting aside the unlawful rates. Evidently realizing that all courts are precluded from taking such action before the Commission has determined the validity of the rates, the State sought to overcome the difficulty by an amendment to its bill of complaint, purporting to withdraw its attack on the rates and assailing the conspiracy alone. But, as the Court seems to recognize, even the amended complaint contains allegations and raises issues as to whether the rates charged by the defendants are discriminatory. The complaint therefore raises questions as to interference with the primary jurisdiction of the Interstate Commerce Commission which are essentially the same as those presented by the original bill.

This verbal maneuver, as a means of conferring jurisdiction on this Court, is futile, for the reason, as we have said, that the State cannot maintain its suit in equity either under § 16 of the Clayton Act or upon general equity principles, without establishing a threatened injury to it or those whom it represents. And this is equally true whether it sues as *parens patriae* or as owner of a railroad, and a shipper and consignee of freight. The threatened injury can ensue only from the maintenance of the unlawful rates and practices, which are specially charged to be discriminatory. But "a rate is not necessarily illegal be-

cause it is the result of a conspiracy in restraint of trade in violation of the Anti-Trust Act. What rates are legal is determined by the Act to Regulate Commerce" and not by the antitrust laws. *Keogh* v. *Chicago & Northwestern R. Co., supra,* 162. Hence it follows in this case that the suit can be maintained only by showing that the alleged conspiracy has resulted or will result in unlawful rates, or that without the conspiracy, lawful rates, other than those now in force, would prevail, determinations which can be made only by the Interstate Commerce Commission, and which must be made by it, before this Court can take any judicial action based upon such determinations.

We assume for present purposes that a conspiracy to fix lawful rates may be a violation of the antitrust laws, as was intimated in the *Keogh* case. But as this Court there pointed out, pages 161–162, the remedy is not to be had by the suit of a private individual; "the Government may have redress by criminal proceedings under § 3, by injunction under § 4, and by forfeiture under § 6." The State cannot, more than a private individual, bring a suit under the Clayton Act to restrain the conspiracy unless it be a conspiracy to do something injurious to the plaintiff. The only such injury alleged in a great variety of ways is that caused by unlawful and discriminatory freight rates established by the conspiracy. No such injury can be presumed from a conspiracy to fix lawful rates or to fix any rate unless it can be known with what new rates those now in force will be replaced by Commission action.

For this and like reasons, this Court has uniformly refused to permit a party under guise of suing under the antitrust laws, to seek in the courts by indirection, determinations which are reserved for the Commission in the first instance. *Keogh* v. *Chicago & Northwestern R. Co., supra; Central Transfer Co.* v. *Terminal Railroad Assn.,* 288 U. S. 469, 476; *Terminal Warehouse Co.* v. *Pennsyl-*

*vania R. Co.,* 297 U. S. 500; and compare *United States Navigation Co.* v. *Cunard S. S. Co.,* 284 U. S. 474; *Armour & Co.* v. *Alton R. Co.,* 312 U. S. 195. As these cases show, the State cannot make its assault on a matter said not to be within the jurisdiction of the Commission, when adjudication must turn upon matters which are within its jurisdiction. Here the Court cannot ascertain and enjoin threatened injury resulting from a conspiracy to fix unlawful freight rates without considering their lawfulness and reasonableness, and thus encroaching upon the authority which Congress has given to the Commission alone. The case is therefore peculiarly one for the application of the rule that equity will not undertake to give relief until the plaintiff has exhausted his administrative remedies, for until that has occurred, it cannot be known that the plaintiff is without adequate relief or, in the event that it is not, what relief equity may appropriately give.

*Second.* Independent of, but supplementing the considerations which indicate the unmistakable intention of Congress that a suit like the present should not be made the means of breaking down the regulatory powers of the Commission, are the provisions of § 16 of the Clayton Act. As already noted, a proviso to the section withholds from "any person" other than the United States the right "to bring suit in equity for injunctive relief against any common carrier subject to the provisions of" the Interstate Commerce Act "in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission."

When the Clayton Act was adopted in 1914, the Commission had already been given broad powers to fix and regulate rates by the Hepburn Act of June 29, 1906, c. 3591, 34 Stat. 584, and the Mann-Elkins Act of June 18, 1910, c. 309, 36 Stat. 539. Congress realized the danger that indiscriminate suits for injunctions under the

antitrust laws, in many cases affecting interstate rail carriers, would substitute the many district courts for the Commission, the single rate-making authority, a retrogression from the consistent Congressional policy to avoid confusion and conflict in this field. Hence, when Congress, by § 16 of the Clayton Act, for the first time authorized private suitors to seek relief by injunction under the antitrust laws, it was at pains to bar such suits against carriers with respect to any matters within the province of the Commission. Thus it was the purpose of § 16 to preclude the breakdown of the unified rate structure established for the nation by the Commission, as would inevitably result from the maintenance under the Sherman Act of numerous individual suits, like the present one, affecting rates which Congress had left within the Commission's exclusive control in the first instance.

The statutory command can no more be evaded than may the exclusive jurisdiction of the Commission to regulate rates, by saying that the "relief" which Georgia seeks is not a matter subject to the jurisdiction of the Commission. Section 16 does not foreclose a suit merely where the "relief" is a matter subject to the jurisdiction of the Commission. Its words are much broader. They deny the remedy, except to the United States, "in respect of *any matter* subject to . . . the jurisdiction" of the Commission. As we have said, Georgia cannot show damage save by showing that the Commission would approve some rate structure other than that presently existing. That is certainly a "matter subject to the . . . jurisdiction" of the Commission, sufficient to preclude a suit under § 16.

The inseparability of equitable relief against a rate-making conspiracy from that against the unlawfulness of the rates which are or may be its fruits, has already been pointed out. Suffice it to say here that precisely the argument now made for disregarding the prohibition of § 16 was rejected by this Court in a suit brought by an injured

private party to restrain agreements or conspiracies to do acts within the jurisdiction of the Commission. *Central Transfer Co.* v. *Terminal Railroad Assn., supra.* And compare *United States Navigation Co.* v. *Cunard S. S. Co., supra,* where this Court gave the like construction to § 16 of the Clayton Act, in its comparable relation to the authority of the Shipping Board to fix rates under the Shipping Act of 1916, c. 451, 39 Stat. 728, 46 U. S. C. §§ 801–842, as amended by the Merchant Marine Act of 1920, c. 250, 41 Stat. 988.

In the *Central Transfer Co.* case it was urged that § 16 of the Clayton Act did not preclude the relief sought, since the Commission did not have jurisdiction over the agreements or contracts complained of, but only over the acts involved in their performance. This Court gave the conclusive answer which we think should be given now, that no injunction could be effectively given against the agreement or conspiracy without in some manner relating it to the lawfulness of the acts done or to be done in execution of the agreement or contract, and that the determination of the lawfulness of those acts and their regulation were within the exclusive jurisdiction of the administrative agency. In that case, as well as in the *United States Navigation Co.* case, it was pointed out that any other construction would defeat the plain purpose of § 16 to preclude, except in suits by the Government, judicial interference with or prejudgment of the lawfulness of matters which Congress has indubitably placed within the jurisdiction of the administrative agency.

Equitable relief under § 16 in the present case must be denied upon the principle identical with that upon which the Court has relied in denying the right of the State to recover damages in the suit which it proposes here. The fact that in this branch of the case, as in *Keogh* v. *Chicago & Northwestern R. Co., supra,* and *Terminal Warehouse Co.* v. *Pennsylvania R. Co., supra,* the suit is for damages

resulting from unlawful rates, instead of an injunction restraining threatened damage or injury, is without significance. For in either case, damage cannot ensue unless the agreement or conspiracy results in an unlawful rate or practice of whose lawfulness the Commission is the sole arbiter. And in both, this Court has held that the suit cannot be maintained without first resorting to the Commission.

Congress did not see fit by its extensive revision of the Interstate Commerce Act in the Transportation Act of 1940, to alter the application of the Clayton Act to the jurisdiction of the Interstate Commerce Commission. For us to alter it now to meet the exigencies of a particular case, which presents no plausible relevant differences from those which we have heretofore decided, is an assumption of power which only Congress could rightly exercise, and a power which it has plainly declined to exercise.

*Third.* Even assuming, as the State does, and as the Court is persuaded, that a court of equity could be called upon to enjoin a conspiracy to establish rates in anticipation of a determination of their unlawfulness, it would plainly be impossible to frame a decree for relief in advance of a determination by the Commission that the present rates are unlawful, or that those resulting from the decree would be lawful. Courts cannot enjoin, in general terms, violations of the Sherman Act, without specifying what acts are to be enjoined as violations, or as aiding or inducing violations. *Swift & Co.* v. *United States,* 196 U. S. 375, 396; *Swift & Co.* v. *United States,* 276 U. S. 311, 328; cf. *New York, N. H. & H. R. Co.* v. *Interstate Commerce Comm'n,* 200 U. S. 361, 404; *Labor Board* v. *Express Publishing Co.,* 312 U. S. 426. Nor can it determine in advance what rates may be lawfully established since the jurisdiction to make that determination is reserved exclusively to the Commission.

Hence the suggestion, which the Court has been persuaded to accept, that this Court can find a way to enjoin the alleged conspiracy to fix rates, without regard to what rates are or may be agreed upon and whether the Commission finds them to be lawful or unlawful, is an invitation to a course of the veriest futility. Any injunction which this Court could properly frame must not be an idle gesture. It must be one to prevent the threatened injury. An injunction to prevent a conspiracy without relation to its injurious consequences could not have that effect, and the injunction could be related to those consequences in this case only by defining rates and practices which the Commission has not declared, and may or may not declare, to be unlawful.

It is futile to attempt to enjoin a conspiracy to fix rates because of their injurious effect on the plaintiff, unless it is known that they are unlawful or will be and unless the Court is free to determine the point. And it is futile for this Court to attempt to prescribe what rates will be lawful since its determination will not be binding upon the Commission, and may be ignored by it. Indeed, even after the Commission has made such a determination this Court, in the first instance, is without power to set it aside, *North Dakota* v. *Chicago & Northwestern R. Co.,* *supra; Texas* v. *Interstate Commerce Comm'n,* 258 U. S. 158, 164–165, for exclusive jurisdiction to set aside an order of the Commission is vested in a district court of three judges under the Urgent Deficiencies Act, c. 32, 38 Stat. 219, as amended, 28 U. S. C. §§ 41 (28), 43.

It is the duty of this Court to dismiss an original suit in which it cannot make an effective decree. See *Arizona* v. *California,* 298 U. S. 558, 572, and cases cited. *A fortiori,* it is its duty not to entertain such a suit.

The soundness and the compelling necessity for the construction which the Court has hitherto given to § 16 of the Clayton Act could not be better illustrated and em-

phasized than by reference to the situation exhibited by the case which is now before us. Any decree, effective to prevent the injury of which the State complains, would necessarily result in further inequalities in rates, such as are now alleged to exist. The Court cannot enjoin as unlawful the alleged conspiracy to establish rates without undertaking to say what rates and practices are to be deemed lawful and what unlawful. But by this determination the Interstate Commerce Commission would not be bound, nor would the United States or any railroad other than those which are parties defendant.

Only Georgia would secure relief approximating that sought by the bill. If relief enjoining the conspiracy complained of were effective to relieve the State of the injury from unlawful rates to which it objects, and without which it could not maintain the suit under § 16, the decree must result in a new rate structure applicable to the railroads which are parties defendant. Prejudice and discrimination would be created as to every other State in southern territory and as to shippers and consignees of freight in those States who would still be governed by the published tariff rates, against which only Georgia and its citizens would have secured some measure of relief. There would be two sets of rates between the south and the north, one, effected as a result of this Court's decree, applicable to shippers in Georgia over the railroads which are defendants here, and another governed by published tariffs approved by the Commission and applicable to all other shippers and railroads in the south. Since illegality in existing rates is averred because of disparity in the level of rates in two rate-making areas, with no allegation that southern carriers receive more than a fair charge for their transportation service, the Court would be required to determine whether the discrimination should be removed by increasing rates in official territory or establishing an intermediate level of new rates, *Interstate Commerce*

*Commission* v. *United States,* 289 U. S. 385, 392—a determination which could be arrived at only by the performance by this Court of the legislative function of rate making which has hitherto been reserved to the Commission.

If all this is to be avoided by the injunction against the alleged conspiracy, but without enjoining any of its asserted evil consequences in rate making, the issue originally tendered would, by the amendment to the bill of complaint, seem to amount to little if anything more than a political issue. The amended complaint alleges that "The wrong done transcends that experienced by individuals. For as men, firms, and corporations have come and gone, the conspiracy has continued over the decades." While trial upon the original complaint might have reduced this grievance to the dimensions of a cause of action to enjoin illegal freight rates injurious to the State, it now appears as the grievance of a section of the country against an existing federal system of rate making, which should be addressed to Congress rather than to this Court.

The support which the Department of Justice lends to Georgia's contentions by the brief amicus, filed in this Court in behalf of the United States, removes any evident need for entertaining this suit. The Government is charged with the enforcement of the antitrust laws, and is authorized by § 4 of the Sherman Act and § 16 of the Clayton Act to maintain suits for that purpose, which others cannot bring. If it believes that the alleged conspiracy exists and should be stopped by the remedial action of courts, without resort to the Commission, there would seem to be no reason why, avoiding the many technical obstacles to the present suit, it should not proceed to remedy in the usual manner the grievances of the citizens of the United States including citizens of Georgia.

Other objections aside, it seems obvious that this Court cannot give any effective relief removing the threat of injury to the State resulting from a railroad rate conspiracy without breaking down the system of rate regulation by the Commission—a system which Congress has painstakingly built up since the decisions, more than forty-five years ago, in *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, and *United States* v. *Joint Traffic Assn.*, 171 U. S. 505, when the Commission was without power to prescribe rates. See *Texas. & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, *supra; Terminal Warehouse Co.* v. *Pennsylvania R. Co.*, *supra,* 513.

The reasoning of the Court is not and cannot be restricted to this case. If Georgia may prosecute the present suit, every shipper or consignee of freight who asserts injury by a conspiracy respecting railroad rates in violation of the antitrust laws may maintain a like suit in a district court. The prosecution of such suits cannot fail to bring chaos into the field of interstate rate making. The entry of decrees for the plaintiffs could only mean the breakdown of the unified system of fixing rates by Commission action, which Congress has ordained by the Interstate Commerce Act. It was the purpose of § 16 of the Clayton Act to preclude such a breakdown. Its purpose can and should be effected by the refusal of this Court to entertain the proposed suit.