**UNITED STATES of America,**
**Plaintiff,**

v.

**NAVAJO FREIGHT LINES, INC., et al.,**
**Defendants.**

**Civ. A. No. C-2468.**

United States District Court,
D. Colorado.

Oct. 26, 1971.

Appeal Dismissed April 3, 1972.
See 92 S.Ct. 1311.

Steven M. Charno, Leonard L. Coburn, James H Phillips, Antitrust Div., Dept. of Justice, Washington, D. C., James L. Treece, U. S. Atty., Carolyn J. McNeill, Asst. U. S. Atty., Denver, Colo., for plaintiff.

George Miron, Wyman, Bautzer, Finell, Rothman & Kuchel, Washington, D. C., E. Houston Harsha, Richard B. Rogers, Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., James J. Morrato, Morrato, Gueck & Colantuno, Denver, Colo., for defendants, Navajo Freight Lines, Inc., United Transportation Investment Co., Navajo Terminals, Inc., F. J. Arsenault, and L. F. Mattingly.

Raymond J. Turner, James E. Hautzinger, Dawson, Nagel, Sherman & Howard, Denver, Colo., L. Charles Johnson, Johnson & Olson, Pocatello, Idaho, for defendant, Garrett Freightlines, Inc.

## MEMORANDUM OPINION

WINNER, Judge.

This is a civil suit brought by the United States charging Navajo Freight Lines, Inc., a motor vehicle common carrier, with violations of §§ 7 and 8 of the Clayton Act (15 U.S.C. §§ 18, 19), because of its interest in and relation to Garrett Freightlines, Inc., another motor carrier. Ninety per cent of Navajo's stock is owned by the United Transportation Co., and Navajo in turn owns all the stock of its subsidiary, Navajo Ter-

minals, Inc., and in this opinion the three companies will be collectively referred to as "Navajo." The individual defendants, Mattingly and Arsenault, were at the time of the filing of the complaint officers and directors of Navajo and directors of Garrett Freightlines. Garrett is named as a defendant, but is allied with the government here as an alleged unwilling victim of the claimed takeover by Navajo.

The Navajo group presently owns at least 26% of the common voting stock of Garrett, and although the Attorney General's theory of the case under the Clayton Act does not depend on a showing that Navajo intends to or is about to take over Garrett, it is alleged that Navajo has indicated an intent to acquire additional shares of Garrett's stock. Further acquisitions were prevented, and the status quo preserved, by order of this Court early in the case.

The complaint alleges that Navajo and Garrett are in direct competition in two respects. They compete for freight shipped between various points in the Western part of the country which both serve directly. They also compete importantly in the market for freight shipped coast to coast because of the nature of their operations and the characteristics of that market. Navajo is presently authorized by ICC certificate to carry freight all the way across the country—from the Northeast and Middle Atlantic states, through the Midwest and Southwest, and on to the Pacific Coast roughly as far north as San Francisco. Garrett serves a much more limited area; it transports freight from the West Coast, including the Pacific Northwest, to eastern terminals at Denver and St. Paul, Minnesota. This allegedly makes Garrett a preferred interchange carrier for eastern carriers with goods moving west whose routes do not extend all the way to the West Coast. Garrett is the only single line carrier whose lines run from Denver and St. Paul to the West Coast, particularly the Pacific Northwest, and eastern carriers would naturally seek to interchange

with such a carrier for the reason that with others, there would have to be additional interchanges enroute. Garrett also is in an advantageous position because eastern carriers can interchange with it without fear of "back solicitation," the practice of directly soliciting the shipper whose goods have been interchanged by another carrier. An eastern carrier would avoid interchanging with Navajo, for example, since Navajo could directly solicit any shipper in the eastern part of the country served by its own routes. Garrett could not "back solicit" such shippers since its routes do not extend to the Eastern states. Additionally, eastern shippers prefer to do business with Garrett since they can receive eastbound freight for destinations beyond Denver and St. Paul after delivering westbound freight to Garrett at those points, thus avoiding an empty backhaul. Thus, Garrett is an important link in a network of regional carriers who compete with larger transnational carriers like Navajo.

■ The Navajo defendants have moved to dismiss for lack of jurisdiction on the ground that primary jurisdiction of all questions with respect to Navajo's influence over Garrett resides with the Interstate Commerce Commission. That point has been ably and extensively briefed by all parties and the case will be resolved on that basis. A hearing previously set in the case was vacated when it appeared that Navajo was engaged in negotiations which might lead to the sale of its interest in Garrett, but we are now informed that no sale is being contemplated, and that the parties wish no oral argument of the motion.

We are of the opinion that the question of primary jurisdiction should be determined as of the time of the filing of the suit in August, 1970. However, the following events have taken place since that time. On February 18, 1971, after the parties had been engaged in settlement negotiations for some time, the ICC initiated its own investigation of whether Navajo was violating either § 5(4) of the Interstate Commerce Act or

§ 7 of the Clayton Act. On June 4, 1971, (after this case was filed) Navajo made application to the ICC under § 5(2) of that Act for permission to acquire a controlling interest in Garrett. The two proceedings before the Commission presumably will be consolidated for consideration.

Section 7 of the Clayton Act prohibits any direct or indirect corporate acquisition of the stock or share capital of another corporation, the effect of which is to lessen the competition between the two. 15 U.S.C. § 18. Section 8 prohibits one person from serving as a director of two or more companies which are in competition with each other. 15 U.S. C. § 19.

It is clear that the Congress has created a dual statutory responsibility for the enforcement of at least § 7 in both the agency and the Attorney General. The parties here are in disagreement over whether § 8 applies to motor carriers at all. Section 15 of the Clayton Act of 1914 specifically granted jurisdiction over violations of the Act to the district courts and authorized the Attorney General to enforce the Act. 15 U.S. C. § 24. Section 11 of that Act additionally vested the ICC with authority to enforce Sections 7 and 8 as against common carriers subject to its regulation. 15 U.S.C. § 21.

That grant of authority has been construed to impose upon the Commission an affirmative obligation to enforce and consider the Clayton Act prohibitions in its proceedings. Denver & Rio Grande Western Railroad Co. v. United States, 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967). However, the courts have consistently rejected the arguments that the dual grant of authority alone should be construed to give the agency exclusive jurisdiction to enforce the provisions, or that it works an implied repeal of the Department of Justice's authority. United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

Section 5(11) of the Interstate Commerce Act gives the ICC power to grant antitrust immunity to certain mergers, consolidations, and acquisitions of control by one carrier over another:

". . . any carriers or other corporations, and their officers and employees . . . participating in a transaction approved or authorized under the provisions of this section shall be and they are relieved from the operation of the antitrust laws . ." 49 U.S.C. § 5(11).

The precursor of Section 5(11) was added to the Interstate Commerce Act by the Transportation Act of 1920 which sought to strengthen the national railroad system as it was returned to private ownership following World War I. That Act substituted a policy of regulated monopoly for the previous emphasis on free competition between common carriers. Compulsory consolidation was proposed and rejected, but voluntary mergers or consolidations with Commission approval were permitted and such approval was to include antitrust immunity. Act of February 28, 1920, ch. 91, § 407; 41 Stat. 480; St. Joe Paper Co. v. Atlantic Coast Line Railroad Co., 347 U.S. 298, 74 S.Ct. 574, 98 L.Ed. 710 (1954) Appendix.

Motor carriers were first subjected to a comprehensive scheme of regulation by the Motor Carrier Act of 1935, and it included a provision authorizing the ICC to immunize acquisitions of control which were "consistent with the public interest." Act of August 9, 1935, ch. 498, § 213; 49 Stat. 543, 555–57. The Transportation Act of 1940 integrated the separate merger and consolidation provisions for all carriers into the present § 5(2) of the Interstate Commerce Act. Act of September 18, 1940, ch. 722, § 7; 54 Stat. 905–10. See, also, McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1943).

Section 5(2) of the Act authorizes the Commission's approval of the exercise of control by one carrier over another,

whether by merger, consolidation, lease, or any other means. The criteria is whether the acquisition of control would be "consistent with the public interest," 49 U.S.C. § 5(2) (b). Section 5(4) makes it unlawful to accomplish or effectuate common control or management of two or more carriers except by application under § 5(2). Control is defined to mean the "power to exercise control or management." 49 U.S.C. § 5(4). Section 5(7) empowers the ICC to investigate and remedy possible violations of § 5(4) upon complaint or upon its own initiative. 49 U.S.C. § 5(7).

A § 5(2) application is the usual and exclusive way of obtaining approval which operatively immunizes one from the antitrust laws under § 5(11). United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226–227, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Pittsburgh & Lake Erie Railroad Co. v. United States, 294 F. Supp. 86, 93 (W.D.Pa.1968). However, it is clear that in a § 5(2) application proceeding, the most relevant consideration is the national transportation policy, not the antitrust laws.

> "Section 5(11) is both a more recent and a more specific expression of congressional policy than § 1 of the Sherman Act and § 7 of the Clayton Act, and in terms relieves the acquiring carrier, upon approval by the Commission of the acquisition, 'from the operation of the antitrust laws. . . .' Although § 5(11) does not authorize the Commission to 'ignore' the antitrust laws, McLean Trucking Co. v. United States, 321 U.S. 67, 80, 64 S.Ct. 370, 88 L.Ed. 544, there can be 'little doubt that the Commission is not to measure proposals for [acquisitions] by the standards of the antitrust laws.' 321 U.S. at 85–86, 64 S.Ct. 370. The problem is one of accommodation of § 5(2) and the antitrust legislation. The Commission remains obligated to 'estimate the scope and appraise the effects of the curtailment of competition which will result from the proposed [acquisition] and consider them along with the advantages of improved service [and other matters in the public interest] to determine whether the [acquisition] will assist in effectuating the over-all transportation policy.' 321 U.S. at 87, 64 S.Ct. 381." Minneapolis & St. Louis Railway Co. v. United States, 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959).

And, there are numerous instances in which the Commission has granted § 5 (2) approval, even though the applicant's prior conduct was in violation of § 5(4). See, Gilbertville Trucking Co. v. United States, 371 U.S. 115, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962); Illinois Central Railroad Co. v. United States, 263 F. Supp. 421 (N.D.Ill.1966), aff'd 385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967).

In addition to the § 5 provisions, the statutory scheme of the Act encompasses almost every aspect of the motor carrier business. Entry into the field is strictly limited; a carrier can operate only under an ICC certificate issued upon the finding that the proposed service is in fact required by the present or future public convenience and necessity. 49 U.S.C. §§ 306–308. Routes are specifically delineated between points fixed in the certificate, and the commodities transportable thereunder may be limited. The Act applies to several subclasses of carriers in addition to general common carriers—contract carriers, private carriers, and transportation brokers. 49 U.S.C. §§ 303, 309, 311, 318. Bonding and insurance protection for the shipping public is required. 49 U.S.C. § 315.

Every aspect of price competition is controlled; rates, rate practices and shipping customs are strictly regulated. 49 U.S.C. §§ 316–17. All tariffs must be filed, posted and published. Reasonable rates and charges are necessary; discriminatory or special rates or rebates are prohibited, as is discriminatory favoritism to any shipper. 49 U.S. C. §§ 2–3, 316–317.

The Commission has extensive information gathering powers over motor carriers. Annual and periodic reports are

required, accounting and depreciation methods are prescribed, and accounts, records, and memoranda of the movement of traffic, as well as accounting and financial data must be available to the Commission in the form prescribed. Special methods of perfection of security interests in vehicles used by motor carriers are set forth by the statute, 49 U.S.C. § 313.

In addition to these controls over the normal operations of the business, the Act requires that carriers have prior Commission authorization for any issue of securities, bonds, or other evidence of indebtedness. 49 U.S.C. §§ 20a, 320. The Commission must find that the issue is for a lawful object, compatible with the public interest, and necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier.

As indicated above, the Act makes extensive provision for Commission control over relationships and agreements between carriers. Section 5 covers all arrangements by which one carrier acquires the right to control the operation of another. It additionally requires ICC approval for pooling or division of traffic agreements between carriers, or any such agreement as to services or gross or net earnings, regardless of whether a "control" situation exists. 49 U.S.C. §§ 5(1), 5b. Such practices may be condemned if they are found unacceptable. 49 U.S.C. § 5(1). Joint rates or charges established by more than one carrier are controlled under the rate provisions referred to above. Furthermore, the Act restricts relationships between motor carriers and other public carriers such as railroads, airlines, or water carriers. 49 U.S.C. § 5b(2), (4).

■ The basic object of the primary jurisdiction doctrine is a workable allocation of business between courts and an agency possessed of expertise in its field and charged with enforcement of a statutory scheme.

"In the antitrust field, it represents a method of accommodating the principle of free competition with the principle that in some economic areas, regulation, restriction, or elimination of competition is required in the public interest." Denver Union Stockyard Co. v. Denver Live Stock Commission Co., 404 F.2d 1055 (10th Cir. 1968).

There is no fixed formula for the application of the primary jurisdiction doctrine, and the cases have usually turned on "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." United States v. Western Pacific Railroad Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

Mr. Justice Frankfurter set forth the classic statement of the policies served by the rule in Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1957):

". . . in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." (at 574–575, 72 S.Ct. at 494).

Recent cases emphasizing the "pervasiveness" of an agency's regulation suggest that a third objective of the doc-

trine should be making the prescribed procedures and the statutory scheme workable.

Development of the primary jurisdiction doctrine as applied to the antitrust laws has varied according to the regulatory statute involved, the nature of the relief sought—whether treble damages, injunction, or a criminal penalty, and the type of violation alleged. Generally the doctrine has been recognized where there was a possibility that an agency might subsequently approve the conduct in question, and that such approval would immunize it from the antitrust laws.

In Georgia v. Pennsylvania R. R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), as in Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), the plaintiffs attacked railroad conspiracies which allegedly had resulted in unfair ICC approved rate schedules. In *Keogh*, the Court held that while the government might have had redress, the suit should be dismissed because initially the rates had been properly considered by the ICC, and because the plaintiff could not possibly establish damages to any degree of certainty, since if the attacked rates were held invalid, there would be no legal rate in effect from which to measure his losses. The implication was that the Sherman Act remedy had been superseded, even though a conspiracy, as distinguished from the rates resulting therefrom, could not have been authorized by the ICC. However, in the *Georgia* case, the state alleged that the railroads had conspired to impede the development of the South by maintenance of a rate system with rates higher there than in the North, and the Court construed the action as one which primarily sought injunctive relief. The Court emphasized that despite its rate making powers, the Commission could not immunize any such conspiracy, though it perhaps had the power to condemn it, and held that Georgia should be permitted to invoke the original jurisdiction of the Supreme Court.

In three cases under the Shipping Act, 46 U.S.C. § 801 et seq., the primary jurisdiction doctrine has been applied to rate setting agreements between maritime carriers on the ground that the Act authorized the Federal Maritime Commission (formerly the Shipping Board) to immunize such agreements and granted it extensive powers to halt any such operations which it did not approve. United States Navigation Co. v. Cunard S.S. Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932), involved allegations that the plaintiff-carrier's competitors had conspired to exclude it from the trade through several means. The Court extended the primary jurisdiction of the Commission to cover agreements which allegedly were being followed, though they had never been filed for approval. In Far East Conference v. United States, *supra*, the Court applied the doctrine as against the Attorney General, even though the agreements in question had never been filed or approved. Mr. Justice Frankfurter emphasized the expertise which the Commission could bring to bear on the questions, and rejected the argument that concurrent antitrust authority would put needed pressure on the conference of carriers to file any such agreement.

Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), would seem to limit those cases somewhat by its holding that the antitrust laws did apply to rate-making agreements which had not been approved by the Federal Maritime Commission, but that where such agreements were "arguably lawful" due to prior Commission approval, and thus immune, the Court should defer to the agency. That case sets forth the clear reason for the rule:

"The plaintiffs in the *Cunard* and *Far East* cases were seeking to enjoin activities which allegedly implemented unapproved agreements even though the Commission had never determined whether those alleged activities constituted the implementation of unapproved agreements. There was a real

risk that the District Court might find that the defendants had implemented unapproved agreements while the commission might find in some later proceeding that the same activities constituted the implementation of approved agreements. This Court decided that the danger of such a conflict could best be avoided by holding that one tribunal or the other had the exclusive right to make the initial factual determination. Since the Commission has specialized knowledge of the industry, the Court concluded that such primary jurisdiction should be vested in the Commission and accordingly instructed the District Court to refrain from acting until the Commission had ascertained and interpreted the circumstances underlying the legal issues." (at 220–221, 86 S.Ct. at 786).

In United States v. RCA, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959), the Court refused to find primary jurisdiction in the Federal Communications Commission which did not have formal statutory power to grant antitrust immunity, although § 7 of the Clayton Act itself exempts transactions approved by the FCC. RCA allegedly had compelled Westinghouse to transfer a Philadelphia television station to the NBC network, but the FCC had approved the transfer despite such objection. The FCC had refused to make any determination on the antitrust question, and they generally did not regard competitive factors as an integral part of their regulatory function.

In California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962), the Justice Department charged two natural gas carriers with violations of § 7 of the Clayton Act when El Paso acquired almost all the stock of Pacific Northwest. El Paso then applied to the FPC for approval of the acquisition under § 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c), and both the Court and the agency were petitioned to allow the other to proceed. The Court finally deferred to the agency, but on review of the final FPC decision,

the Supreme Court held that primary jurisdiction was in the Court and that the agency should not have acted while the transaction was being challenged in the Court even though it did so with express permission.

§ 7 of the Clayton Act excepts from its coverage transactions authorized by the FPC, but the FPC had no explicit jurisdiction to enforce the Clayton Act nor did the Natural Gas Act specifically provide for grants of antitrust immunity. The Natural Gas Act empowers the FPC to authorize acquisitions of the assets of other natural gas companies, but it does not cover stock acquisitions in companies with such assets. The Court noted that there was no provision similar to § 5(11) of the Interstate Commerce Act which specifically provides for grants of immunity for carrier mergers, and emphasized that "there is no pervasive regulatory scheme including the antitrust laws that has been entrusted to the Commission." 369 U.S. at 485, 82 S.Ct. at 904. The Court pointed out several possible conflicts between the exercise of jurisdiction by both the Court and the agency, and said that the "orderly procedure" was for the Court to proceed to decision first.

In Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), the Attorney General, at the Civil Aeronautics Board's request, charged Pan Am and W. R. Grace Co. (Grace Lines) with violations of the Sherman Act for their operation of Panagra, another airline jointly owned by them. They allegedly had conspired to allocate South American air routes between Pan Am and Panagra, and Pan Am had blocked Panagra from extending its routes from the Canal Zone northward to the continental United States. The Court held that the CAB should have primary jurisdiction of the dispute even though the agency itself felt that it was unable to deal with the problem.

The CAB had both power to immunize any acquisition of control by one air carrier over another, and broad authority to restrain unfair or deceptive practices

or unfair methods of competition between air carriers. See, generally, 49 U.S.C. § 1301 et seq. Mergers, consolidations, or pooling arrangements approved under Sections 408, 409 or 412 of the CAB Act, (49 U.S.C. §§ 1378, 1379, 1382) were excepted from the antitrust laws by Section 414 (49 U.S.C. § 1384), but as pointed out by the dissenting opinion, the specific conduct which was challenged could not have been immunized thereunder. The CAB was authorized but not obligated to enforce the Clayton Act, but not the Sherman Act. The Court characterized the Board's route allocation and division of territory functions which were central to the complaint as the "precise ingredients" of the regulatory scheme. Emphasizing the "pervasiveness" of the regulation, the Court thus extended application of the doctrine to a case where the regulatory system included authority to enforce the antitrust laws and to afford substantially identical relief against anticompetitive activity under its own statute, even though the formal antitrust immunizing authority was restricted to certain "control" situations and express intercarrier agreements.

The Court refused to apply primary jurisdiction in United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), where the banking agencies had approved the merger in question. The Bank Merger Act of 1960 directed the bank agencies to consider competitive factors in granting such approval, but it contained neither enforcement nor immunizing powers. The Court said:

> "Plainly, the range and scope of administrative powers under the Bank Merger Act bears little resemblance to those involved in Pan American." 374 U.S. at 351–352, 83 S.Ct. at 1735.

> "Moreover, bank regulation is in most respects less complete than public utility regulation, to which interstate rail and air carriers, among others, are subject." 374 U.S. at 352, 83 S.Ct. at 1735.

"[The] doctrine requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." 374 U.S. at 353, 83 S.Ct. at 1736.

In applying the "pervasiveness" test in Denver Union Stockyard Co. v. Denver Live Stock Commission Co., *supra*, the Tenth Circuit relied on these factors: the lack of any antitrust immunizing power, lack of any power over acquisitions or mergers, no need for any administrative expertise, and no possible interference with "the coherence or uniformity of an intricate administrative program." 404 F.2d at 1059.

Summarizing, then, we think the cases establish that the doctrine is properly applied where there is a clear possibility that the agency may immunize precisely that conduct which is the basis of the antitrust complaint, or where the agency is empowered to remedy anticompetitive practices under its own statute while immunizing some others, and is entrusted with enforcement of the antitrust laws themselves, even though its immunizing powers do not extend precisely to the conduct in question.

We think that this case falls within either part of that rule, and we hold that the policies behind the primary jurisdiction doctrine and the cases which have applied that doctrine require its application here. It is clear that regulation of the motor carrier industry under the Interstate Commerce Act is at least as pervasive as any regulatory scheme which has received judicial consideration. In addition to the ICC's regulatory power over almost every aspect of a carrier's operation, the agency has been entrusted with enforcement of and is required to enforce the antitrust laws. Denver v. Rio Grande Western Railroad Co. v. United States, *supra*.

The Court indicated in California v. Federal Power Commission, *supra*, that the regulatory scheme under the Interstate Commerce Act, as opposed to that under the Natural Gas Act, there under

consideration, was sufficiently pervasive to call for application of the doctrine. The Court's comment in *Philadelphia National Bank, supra,* also suggests that primary jurisdiction should be in the agency here:

"In Pan American, the Court held that because the Civil Aeronautics Board had been given broad powers to enforce the competitive standard clearly delineated by the Civil Aeronautics Act, and to immunize a variety of transactions from the antitrust laws, the Sherman Act could not be applied to facts comprising the precise ingredients of a case subject to the Board's regulatory and remedial powers; in contrast, the banking agencies have authority neither to enforce the antitrust laws against mergers, [citation omitted] nor to grant immunity from those laws.

"In the California case, on the other hand, the Court held that the FPC's approval of a merger did not confer immunity from § 7 of the Clayton Act, even though, as in the instant case, the agency had taken the competitive factor into account in passing upon the merger application." 374 U.S. at 351, 83 S.Ct. at 1735.

Comparison of the CAB authority involved in *Pan Am* leads to the conclusion that the primary jurisdiction doctrine must be applied here. The CAB and ICC immunity provisions are virtually identical. Both immunize certain transactions approved by the agency under specific provisions dealing with pooling arrangements or agreements on the division of traffic, service, equipment, or earnings, 49 U.S.C. § 5(1); 49 U.S.C. § 1382, or mergers, consolidations, unifications, and other acquisitions of control, 49 U.S.C. § 5(2); 49 U.S.C. § 1378. Accomplished acquisitions as well as prospective ones can be approved under either statute. There is no specific ICC provision analogous to § 409 of the CAB Act (49 U.S.C. § 1379) which deals with interlocking officer and director relationships, but such relationships could presumably be authorized as one facet of a control acquisition approved by the ICC under § 5(2).

The CAB's investigative and cease and desist power discussed in *Pan American* extended to any unfair or deceptive practice or unfair method of competition, 49 U.S.C. § 1381. Admittedly, in this respect the CAB authority is broader than is the ICC's § 5(7) remedial power which requires a threshold finding that control has been improperly accomplished without § 5(2) approval. However, in any situation found by the ICC to involve control, their § 5(4) power to correct the abuse would be equally as extensive. Furthermore, when the ICC's complimentary Clayton Act powers are aligned with its § 5 powers, there is a complete and integrated enforcement scheme. The agency can investigate any questionable conduct, and if it finds that a control situation exists, approve or condemn it under § 5. The ICC can authorize an acquisition under § 5(2) even where the carrier's pre-application conduct violates § 5(4). Gilbertville Trucking Co. v. United States, *supra.* If control has not been effectuated, the agency could approve such an acquisition prospectively, or use its Clayton Act cease and desist powers to correct any violation which appeared, 15 U.S.C. § 21.

The Courts have usually looked only to the agencies' own statutory authority in deciding whether to apply the primary jurisdiction doctrine, but we think that the ICC's Clayton Act powers cannot be ignored. Several recent cases have emphasized the importance of the agency being entrusted with the enforcement of the antitrust laws as an element of the pervasiveness of the regulatory scheme. The ICC is held to be obligated, not merely authorized, to enforce the Clayton Act provisions in most of its proceedings. More importantly, we think it proper to consider those powers as an integral part of the regulatory scheme since they are crucial to the ICC's retention of its exclusive power to define "control" for purposes of the Interstate Commerce Act.

We think that the *Pan American* case holds that the clear possibility at the time of filing that the ICC would later approve a control relationship between Navajo and Garrett requires that we find that the agency has primary jurisdiction here. There need not have been any administrative proceedings pending at that time for application of the doctrine. Even if *Pan Am* is an extension of the Court's previous applications of the doctrine as contended by the dissenting opinion, our case would come precisely within the dissenters statement of the rule:

" . . . to apply the doctrine of primary jurisdiction to the case at bar would be somewhat of an extension of our decisions in the area, so jealously have we guarded the obligation of judicial enforcement of the antitrust laws. The tendency of the cases has been to invoke the doctrine not when there are simply overlapping judicial and administrative remedies for the same conduct, as is the case here, but only when *'there is a possibility that a subsequent administrative decision would approve the questioned activities,'* as is not true here, since the approval power vested in the CAB by § 414 does not include orders under § 411." [citations omitted] [emphasis added].

The definition of control under § 5 and the power to develop such definition are central to the dispute in this case. Navajo argues with some plausibility that what we really have here is a dispute between the Commission and the Department of Justice over what should be recognized as "control" for purposes of the Interstate Commerce Act. The government concedes that the Commission has exclusive jurisdiction over the question of whether one carrier controls another, but they then argue that they should have unrestricted concurrent power to enforce the Clayton Act in any situation involving an incipient violation of § 7 which falls short of an acquisition of control.

Their theory here is that:

" . . . the Navajo defendants' ownership of a minority interest in a competitor together with active participation in the latter's management for a period of six years gives rise to anticompetitive effects even in the absence of 'control.' " (Original Brief of the United States In Opposition to Defendants' Motion to Dismiss, pp. 3–5).

The test for a § 7 violation is "whether at the time of suit, there is a reasonable probability that the acquisition is likely to result in the condemned restraints," United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), and a company need not acquire control of another company to violate the Clayton Act, Denver & Rio Grande Western Railroad Co. v. United States, *supra.*

However, the theoretical appeal of the government's distinction is thoroughly dispelled by the facts here. The Attorney General says that this case comes within our jurisdiction even if Navajo does not now have the power to control Garrett. We cannot ignore the fact, however, that the Commission's initiation of an investigation under § 5(7) indicates clearly that they are of the opinion that an illegal control situation may now exist. And, we think it fair to say that the central evil contemplated by the complaint, as in any § 7 case, is the disappearance of Garrett as an effective competitor due to Navajo's takeover.

Accepting for the purpose of argument the Attorney General's right to proceed in non-control situations, we think that such a division of responsibility would be workable only if the agency was also entitled to primary jurisdiction in those cases where the alleged violator "arguably controlled" the second company. Such a protective buffer is suggested by the "arguably lawful" standard for unapproved maritime conference agreements put forth in *Carnation Co., supra.* The government opposes that construction, arguing that the only way a carrier can obtain protection for a control rela-

tionship is by § 5(2) application. We think that such a standard is too restrictive, and that the rule is that primary jurisdiction should be applied wherever there is a real possibility that the agency might later immunize the questioned conduct. It need not have been immunized as of the time of suit. In the *Carnation Co.* case, *supra,* the Court indicated that an agency should proceed where:

> "There was a real risk that the District Court *might find* that the defendants had implemented unapproved agreements while the commission *might find in some later proceeding* that the same activities constituted the implementation of approved agreements." 383 U.S. at 220, 86 S.Ct. at 786.

An "arguably control" standard would require some difficult definitional line-drawing like any other, but it could perhaps provide the needed leeway for the agency's exercise of its discretion to define control. Applying that test, we must assume that Navajo arguably controls Garrett.

However, utilization of such an intermediate standard would really result in a judicially created standard derived from the Commission's definition of control. And the problem of conflict between Court and agency over such a definition would be the same as that posed by a control—non-control test. Besides, later Commission approval could still be forthcoming even though the acquiring company had not previously "arguably controlled" the other. The Congress has pretty clearly indicated that the agency should retain the power to define what amounts to control under the Act:

> "In the context of the Interstate Commerce Act 'control' is a word of art. It is a concept with which the Commission is uniquely qualified to deal in the light of its experience in this particular area. For this reason Congress has left it to the Commission to determine whether under all of the circumstances 'control' exists in a

given case. In Gilbertville Trucking Co. v. United States, (citation omitted) the Court said:

> 'Section 5(4) is part of a comprehensive legislative scheme designed to place ownership, management, and operational control over common carriers within the regulatory jurisdiction of the Commission.
>
> \*     \*     \*     \*     \*
>
> 'We . . . have left to the agency charged with enforcement the determination from the facts whether "control" exists, subject to normal standards of review. . . In this manner, the Commission may adapt § 5(4) to the actualities and current practices of the industry involved and apply it to the extent it feels necessary to protect its jurisdiction under § 5(2). . . . ' "

B. F. Goodrich Co. v. Northwest Industries, Inc., 303 F.Supp. 53 (D.Del. 1969), aff'd 424 F.2d 1349 (3 Cir. 1970).

In Chicago South Shore & South Bend Railroad Co. v. Monon Railroad, 235 F. Supp. 984 (N.D.Ill.1964), where one railroad sought an injunction based on § 5 restraining another from purchasing its stock until such time as the ICC ruled on a pending § 5 application for control, the Court said:

> "Congress has wisely placed great confidence in the expertise of our regulatory agencies. That its intent was to create exclusive primary jurisdiction in the ICC in 'control' matters of this kind is abundantly clear from the statutory scheme of the Act." 235 F.Supp. at 986.

We note in passing that there are numerous cases in which the ICC has recognized that control existed in situations where the acquiring carrier had the right to vote only a minority share of the other carrier's stock. See, e. g., Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957), (10% control of Board of Directors); Illinois Central Railroad Co. v. United States, 263 F.Supp. 421 (N.D.Ill.1967), aff'd,

385 U.S. 457, 87 S.Ct. 612, 17 L.Ed.2d 509 (1967), (31½% amounting to veto power equals "some measure of control" in violation of § 5(4)).

Chief Judge Arraj's decision in Litvak Meat Co. v. Denver Union Stock Yard Co., 303 F.Supp. 715 (D.Colo.1969), that the Secretary of Agriculture should have primary jurisdiction to determine whether certain practices were "stockyard services" within the meaning of the Packers and Stockyards Act, 7 U.S.C. § 181 et seq., and whether they were "unjust, unreasonable, or discriminatory" thereunder, supports recognizing the primary jurisdiction of the ICC here in order to protect its power to define "control." The language of *Litvak Meat* has particular relevance here:

> "While in one sense it might be said that the Secretary has no jurisdiction unless stockyard services are involved, administrative officers and agencies, as well as courts, have jurisdiction to determine, at least initially, their own jurisdiction. The purposes of the doctrine are particularly well served when the administrator is first allowed to determine the coverage of the statute he is charged with administering." 303 F.Supp. at 723.

Therefore, we are of the opinion that primary jurisdiction of any case alleging violations of § 7 of the Clayton Act through one motor carrier's acquisition of stock in another should rest with the Interstate Commerce Commission. Though the question of one carrier's control over another is not a "precise ingredient" here in exactly the same sense that route allocations and territorial divisions were "precise ingredients" of the CAB's power in *Pan American*, the control question seems to us to be at the heart of every case in which acquisitions of stock in a competitor are attacked. This rule, of course, would not prevent the government from proceeding either criminally, or civilly after the ICC's initial determination that a control relationship should not be approved, though such a proceeding would probably be unnecessary since the ICC can exercise the

full range of Clayton Act powers. Nor would this rule necessarily extend to conspiracy cases, or cases involving other antitrust violations such as monopolization of the customer market or improper rate fixing practices as charged in Marnell v. United Parcel Service of America, Inc., 260 F.Supp. 391 (N.D.Cal.1966).

The Commission also should have primary jurisdiction of the interlock violations of § 8 of the Clayton Act which are alleged here. Arsenault's and Mattingly's positions as directors of Garrett were gained solely through Navajo's voting of its Garrett stock, and any such violation is thus inextricably bound up with the § 7 violation charged. The government contends that motor carriers are subject to § 8 despite the specific exclusion therein:

> "No person at the same time shall be a director in any two or more corporations . . . other than banks, banking associations, trust companies, and common carriers subject to the Act to regulate commerce, approved February fourth, eighteen hundred and eighty seven . . . ." 15 U.S.C. § 19.

Navajo argues that motor carriers are exempted thereunder but are subject to the restrictions of Section 10 of the Clayton Act on interlocking relationships, 15 U.S.C. § 20. Aside from this applicability problem, we think that any such relationship could clearly be authorized as one method of effectuating control under § 5(2), and that the Commission should have primary jurisdiction over any such § 8 complaint which is so related to an alleged § 7 violation.

Garrett forcefully argues that concurrent power of the Attorney General to prosecute § 7 violations is necessary in order to insure that carriers contemplating acquisitions make application under § 5(2) at the earliest possible date. In the *Far East Conference* and *United States Navigation Co.* cases, *supra,* the Court rejected such a "prompt early filings" argument with respect to the unfiled and unapproved maritime conference agreements being challenged

there. The further answer is that under § 5(7) of the Act, either the government or a competitor may initiate ICC investigative proceedings and the Commission would be obligated to consider any possible Clayton Act violations therein. § 11 of the Clayton Act also provides a procedure for administrative determinations of complaints by competitors. 15 U.S.C. § 21.

Further, we think the policy justifications for the primary jurisdiction doctrine require its application here. First, while the courts have been the major forum for the development of the Clayton Act, it is clear that we have no particular expertise with respect to competition between motor freight carriers. That body of knowledge rests with the ICC, and we are most willing to defer to the Commission to permit it to exercise its expertise in a most complex field.

Moreover, there is a clear chance of direct conflict here, both as to any relief which ultimately might be granted, and as to the definition of the critical "control" standard for purposes of the Interstate Commerce Act. The government seeks an order requiring Navajo to divest itself of its stock in Garrett. Were we to order such divestment, there would be a clear conflict if the Commission later permitted Navajo to acquire Garrett. The possibility of such an approval has increased to some degree with Navajo's filing of its § 5(2) application. Our order probably would not be a major obstacle in such a situation, but any steps taken by Navajo to actually divest themselves of the stock would require extensive undoing. Navajo could suffer considerable loss in that process, on top of the expense of engaging in a two-front administrative and judicial battle, and in carrying out any required divestment transaction. The double proceeding problem would confront Navajo even if we were finally to order only that Navajo not acquire any additional interest in Garrett. Certainly, the necessary predicate to any finding that jurisdiction rests in the Court would be a determination that in this case, Navajo does not control

Garrett within the meaning of § 5 of the Act. Yet, as indicated above, the control question always depends on the particular facts and circumstances of each case, and accordingly, the courts have repeatedly refused to entertain suits which would require initial interference with the Commission's exclusive power to determine what constitutes control. B. F. Goodrich Co. v. Northwest Industries, Inc., *supra*; Chicago South Shore & South Bend Railroad Co. v. Monon Railroad, *supra*.

Lastly, we think that granting the ICC primary jurisdiction of § 7 cases which involve stock acquisitions by one carrier in another would facilitate orderly administration and make the statutory scheme more workable. Only the Commission can provide the full range of possible remedies under both § 7 of the Clayton Act and § 5 of the Interstate Commerce Act, and either the Attorney General or a competing carrier who may or may not be the object of the takeover can petition the ICC for relief in incipient control situations under either Act, 49 U.S.C. § 5(7); 15 U.S.C. § 21.

Commission deliberations may ultimately take longer than the proceedings in this Court, but a broader range of factors must be considered there, and since there is little chance of injury to the public in the interim, the opportunity to obtain a comprehensive judgment on all possible aspects of the relationship would seem to justify any such delay.

Having decided that this is a proper case for application of the primary jurisdiction doctrine and deference to the ICC, we reach the question of whether to dismiss or hold this action in abeyance pending the Commission's determination. We are of the opinion that dismissal is the proper course here since the Attorney General seeks injunctive relief, not damages, and such a suit can easily be reinstated at any future time. Further, the ICC itself will be able to provide complete relief to all parties concerned in its proceedings. Therefore, it is ordered that the defendant Navajo Freightlines' Motion to Dismiss is hereby granted.